NATHAN GOLDSMITH, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

ISIDOR GOLDSMITH, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 57619, 57620. Filed October 10, 1958.

*Harold Davis, Esq.,* for the petitioners.
*John F. Walsh, Esq.,* for the respondent.

**60**

[redacted]

OPINION.

Raum, *Judge:* 1. *Cost of goods sold in the fiscal years ending June 30, 1944 and 1945.*—At the outset, it must be stressed that sales in the aggregate amounts of $276,985.70 and $222,070.52 did not appear on the partnership books for the fiscal years 1944 and 1945, respectively, and that the sales on the partnership returns for those years were understated in those amounts. This the petitioners do not controvert. They argue, however, that their costs of that merchandise were equal to the sales price, and that such costs were similarly not reflected on the books or returns, with the consequence that their net profits were therefore correctly reported. We listened attentively to Nathan's testimony, in which petitioners' story was told, and have since carefully reviewed it in the light of the entire record. It puts too great a strain upon our credulity; we do not believe it.

In substance, Nathan testified that during these years Manhattan acquired large quantities of syrup, which was then in short supply, from or through certain persons whom he knew only as "Bill" or "Jim," or who were otherwise not satisfactorily identified; that such syrup was diluted by Manhattan so as to yield an "overplus" of about 9 per cent;[1] that a volume of the diluted syrup equal to the volume originally acquired would be sold by Manhattan to certain large purchasers identified as "Coca Cola," "John DeKuyper & Son," and

---

[1] Nathan testified as to a figure of 9½ per cent as well as a figure of 9⅓ per cent. His counsel took the position that it was 9.11 per cent. On brief, he takes the position that it was 8.57 per cent.

others; that the checks obtained from such purchasers would be cashed or otherwise converted into cash; that all of the cash thus obtained would then be used to pay for the syrup thus acquired by Manhattan; that Manhattan derived no profit from the transactions, except to the extent that the "overplus" obtained upon diluting the syrup was sold; and that the sales of such "overplus" were fully reflected on its books and returns.

Apart from the impression as to Nathan's credibility which we obtained while he was testifying, much of the story is at odds with other relevant evidence. Thus, the record shows that Manhattan paid commissions to brokers in the amounts of $26,204.11 and $17,762.36 in the fiscal years 1944 and 1945 (which were deducted on its returns for those years), and we are convinced on the evidence that such commissions were paid primarily with respect to the unrecorded sales.[2] But simple arithmetic discloses that these commissions in the aggregate are approximately equal to 9 per cent of the unrecorded sales, thus virtually wiping out the so-called profit derived from sale of the "overplus."[3] Accordingly, if Nathan's explanation is to be believed, all these transactions would have resulted in substantially no profit to Manhattan. This is too much for us to swallow.

Manhattan was dealing in a commodity that was in short supply. The quantities of goods involved were large. The method of operation was highly irregular. It is inherently incredible, without a fuller and better explanation than was given to us, that such transactions were carried on without any profit or at most at a comparatively insignificant profit.

Moreover, if Manhattan actually purchased for cash in the manner testified to by Nathan, testimony of the vendors would have been valuable. But petitioners did not call any of the alleged vendors to the witness stand. Furthermore, despite the fact that petitioners have been connected with the sugar trade for over 30 years and claimed to have had extensive dealings with these vendors they maintained that they knew them only by "names like Bill and Jim."

We need not prolong this discussion with an analysis of other aspects of the evidence that discredit Nathan's story. Suffice it to say

---

[2] When first interrogated about the commissions, Nathan testified in substance that brokers were used only in transactions that involved syrup acquired by Manhattan in the manner outlined above. Subsequently, after a recess, he stated, in response to questions put by his counsel, that the brokers' fees included sales of other commodities as well as syrup. However, upon further interrogation, we were fully satisfied that if such fees did include any amounts paid to brokers in connection with sales of other commodities, such amounts were comparatively inconsequential. Nathan's vagueness in this connection was hardly reassuring.

[3] Although there is no direct evidence as to the amounts received on the sales of the alleged "overplus," it is reasonable to conclude that they were made at the same prices as the other sales, for the testimony is to the effect that sales of the "overplus" were made to purchasers within the same group, and there is no suggestion that such sales were consummated on any different terms.

we have carefully studied the entire record, and do not find his testimony convincing.

Considering our impression of petitioners and viewing their testimony in the light of the whole record, we cannot avoid the belief that their testimony was unreliable. We cannot find that Manhattan had unrecorded costs equal to the total of its unrecorded sales.

Although we are fully persuaded that Manhattan derived profits from the unrecorded sales that were not reflected on its books or in the returns and that petitioners are not entitled to have the costs of goods sold augmented in amounts equal to the sales prices, we nevertheless do not agree with respondent that nothing is to be added to the cost of goods sold. True, the burden of proof was upon petitioners, and they have provided us with very little, if anything, in the way of evidence upon which to make a finding in this respect. However, we have combed the record carefully, particularly the books introduced in evidence, and are of the opinion that the costs of the syrup involved in the unrecorded sales were similarly unrecorded. We must therefore make some finding as to such costs. Although the evidence is not satisfactory for this purpose, we must do our best with the materials at hand. As was said in *Cohan* v. *Commissioner*, 39 F. 2d 540, 543–544 (C. A. 2):

Absolute certainty in such matters is usually impossible and is not necessary; the Board should make as close an approximation as it can, bearing heavily if it chooses upon the taxpayer whose inexactitude is of his own making. * * *

Cf. *David J. Pleason*, 22 T. C. 361, 371, affirmed 226 F. 2d 732 (C. A. 7), certiorari denied 350 U. S. 1006; *Michael Potson*, 22 T. C. 912, 929, affirmed 230 F. 2d 336 (C. A. 7); *Rogers* v. *Commissioner*, 248 F. 2d 452 (C. A. 7). Bearing in mind the admonition of the Court of Appeals in the *Cohan* case, it is our best judgment and we have found as a fact that the cost of merchandise involved in the unrecorded sales was $210,000 for the fiscal year 1944 and $165,000 for the fiscal year 1945.

2. *Cost of goods sold in the fiscal year ending June 30, 1947.*—The notices of deficiency contain an explanation which indicates that respondent accepted the figures on Manhattan's amended return, thereby decreasing purchases by $6,500, and in addition disallowed purchases totaling $56,525.88 on the ground that they were unsubstantiated. At the trial petitioners contested the full $63,025.88 reduction in purchases.

Petitioners' evidence on this issue is very unsatisfactory. We searched Manhattan's "Purchase Journal" and found entries purporting to indicate cash purchases, but on the basis of the whole record we cannot hold that these purchases have been established as claimed.

Nathan's testimony in explanation of the circumstances surrounding the entries did much to confuse us. However, taking into account the record as a whole, including Manhattan's amended return, we have found as a fact that of the amount in controversy, $44,000 represents cost of goods sold in the fiscal year 1947 and that the remainder was properly disallowed. The issue here is somewhat similar to the one considered above for the years 1944 and 1945.

3. *Deductions.*—The Commissioner disallowed a number of deductions for each of the years involved. The opening statement of petitioners' counsel at the hearing indicated that only two classes of such disallowances were in controversy, namely, "in the case of traveling expenses in three years, and in the case of legal expenses in two years." The particular years referred to were not satisfactorily identified. Moreover, the petition filed in each case, as it relates to this issue, was woefully defective under our rules. Rule 7 (*c*) (4) plainly requires that:

> (4) The petition shall contain:
>
> *　　*　　*　　*　　*　　*　　*
>
> (B) Numbered paragraphs stating:
>
> *　　*　　*　　*　　*　　*　　*
>
> 4. Clear and concise assignments of each and every error which the petitioner alleges to have been committed by the Commissioner in the determination of the deficiency. * * * Each assignment of error shall be lettered.
>
> 5. Clear and concise lettered statements of the facts upon which the petitioner relies as sustaining the assignments of error, except those assignments of error in respect of which the burden of proof by statute is placed upon the Commissioner.

These provisions are substantially identical with the comparable provisions in Rule 7 (*c*) (4) of the January 1, 1954, edition of the Revised Rules which were in effect at the time that the petitions were filed.

Paragraph 4 of each petition deals with the assignments of error. It is set out in full in the margin.[4] Although it complains that the Commissioner failed to give taxpayer credit for purchases "and other business deductions," it nowhere sets forth what adjustments relating

---

[4] 4. The determination of tax and liability set forth in the said notice of deficiency is based upon the following errors: The Commissioner in making the deficiency assessment neglected to give taxpayer credit for purchases and other business deductions; the Commissioner based his assessment erroneously upon gross sales and failed to deduct cost of the goods which were sold and other rightful business deductions; the said Commissioner based his deficiency upon surmise, guess and estimate and failed to base the said assessment upon the best available data and business information which would have enabled said Commissioner to arrive at a fair and definite assessment of tax, if any; and the said Commissioner also committed other errors in making the deficiency assessment aforementioned which, petitioner begs leave to present in an amended petition, as and when the facts may become available for presentation to him and his attorney, all as further set forth in paragraph "6" hereof.

to deductions are challenged. And in paragraph 5, apparently purporting to comply with our requirement for a statement of facts upon which petitioner relies as sustaining the assignments of error, there are no allegations whatever dealing with any of the deductions disallowed by the Commissioner.

To be sure, paragraph 6 of each petition states that petitioners' attorney was in Europe beween March 5 and April 13, 1955, that petitioner was unable to communicate with his attorney until April 21, 1955, and gives notice that an amended petition might be presented containing more definite facts. However, apart from the fact that the notice of deficiency was dated January 31, 1955, and that the petition was filed on May 2, 1955, signed by petitioners' attorney, no such reservation as is set forth in paragraph 6 can effectively nullify the requirements of our rules. Moreover, no amended petitions were in fact offered for filing, and the proof which petitioners attempted to present at the trial in relation to the deductions was so fragmentary, vague, and sloppy, that we would not favorably consider a motion "to conform pleadings to proof" even if it were presented and otherwise complied with the requirements of our Rule 17 relating to such motions.

In view of the foregoing we cannot hold that the Commissioner erred in any of his adjustments disallowing deductions.

4. *Fraud.*—We think that respondent has carried his burden of proving fraud by clear and convincing evidence for the years 1944 and 1945. The evidence of deliberate omission of substantial amounts from Manhattan's gross receipts and the destruction of all records relating to the unrecorded sales is strong and persuasive. Moreover, petitioners pleaded guilty to charges of willfully and knowingly attempting to defeat and evade a large part of their income tax for 1945, a year in which their operations in respect of unrecorded sales followed the same pattern that characterized such transactions in 1944. We are fully convinced that parts of the deficiencies in both years were due to fraud with intent to evade tax. Although Nathan was the principal actor in this drama, we are also satisfied that Isidor knowingly participated therein. Not only did he cash a number of the checks involved, but he ran the business for a period of some months in 1944 when Nathan was in prison in connection with an O. P. A. offense. The Commissioner's determination of fraud is sustained.

*Decisions will be entered under Rule 50.*