Richard W. Chominski and Genevieve J. Chominski v. Commissioner.
Chominski v. Commissioner
Docket Nos. 3787-66, 1282-67.
United States Tax Court
T.C. Memo 1971-1; 1971 Tax Ct. Memo LEXIS 332; 30 T.C.M. (CCH) 1; T.C.M. (RIA) 71001; January 5, 1971, Filed. Max A. Reinstein, 110 S. Dearborn, Chicago, Ill., for the petitioners. James E. Caldwell, for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent has determined deficiencies in petitioners' income tax of $22,900.06 and $5,637.97 in 1959 and 1960, respectively. *333 He has also sought to impose additions to that tax under section 6653(b) of the Internal Revenue Code of 1954[1] of $11,450.03 in 1959 and $2,818.99 in 1960. The questions presented for decision are: (1) Whether and to what extent petitioners failed to report income for the years in issue; and (2) whether any part of any underpayment of tax is due to fraud. Findings of Fact Many of the facts have been stipulated and are so found. The stipulation and the exhibits appended thereto are incorporated herein by this reference. Petitioners, Richard W. Chominski (hereinafter referred to as petitioner or Richard) and Genevieve J. Chominski, are husband and wife and at the time of the filing of the petitions in these cases resided in Chicago, Illinois. They filed joint Federal income tax returns for the years 1959 and 1960 on the cash basis with the district director of internal revenue in Chicago, Illinois. Richard's mother, Pearl Chominski (hereinafter referred to as Pearl), owned her own home during all relevant years and lived there until her death in 1963. *334 Pearl's sources of income included insurance benefits which began in 1944 by reason of the death of one of her sons in World War II, social security benefits which began in 1955, and rent that she received from her sister in the early 1950's. In addition, Pearl's third son, Alex Chominski (hereinafter referred to as Alex), contributed between $30 and $35 per week to the support of her household during the years in issue and for many years prior thereto. Alex also paid the taxes and partially maintained the building which his mother owned and in which they lived. On her death, Pearl had cash in excess of $1,000 as well as various coins of substantial value in a cigar box in her dresser bureau. Richard visited his mother frequently during 1959 and 1960. As she was getting along in years, Pearl often discussed giving some of her money to Richard in order to enable him to purchase a home and to educate his children. In fact, Richard received gifts of money from Pearl not only in 1959 and 1960 but also prior to 1959 and subsequent to 1960. When Richard received the gifts, which Pearl always made in cash, 2 he would deposit them as soon as possible in a savings and loan association. *335 Thus, on December 14, 1959, he deposited his mother's gift of $4,000 in savings account 1715 at the Trident Savings and Loan Association in Chicago. On February 11, 1960, he deposited a similar gift of $4,000 in savings account 16044 at the General Federal Savings and Loan Association in Chicago. Pearl and Richard, as joint tenants with the right of survivorship, maintained account 29501 at the Fairfield Savings and Loan Association in Chicago. That account received deposits of $53.30 in 1959 and $300 in 1960 and earned interest of $238.15 in 1959 and $265.33 in 1960. Alex, who was unmarried and lived with his mother until her death, was a drill grinder and in 1959 had gross earnings of approximately $135 per week. In 1958, Alex and Richard opened account 2486 at the Fairfield Savings and Loan Association in Chicago as joint tenants with right of survivorship. Alex made the initial deposit in this account from another joint account which he had held with his father. [2] He also made all subsequent contributions to this account through 1960. In 1959 he contributed $3,300 and in 1960 he contributed $1,000. Account 2486 earned interest in the sum of $560 in 1959 and $670 in 1960, *336 all of which Alex reported as income for tax purposes. Likewise, in 1952, Alex and Richard opened joint account 70497 at the Main Street Bank in Chicago. As with account 2486, Alex was the sole contributor to account 70497, but he made no deposits in 1959 or 1960. Account 70497 earned interest in the sum of $9 in 1959 and $9 in 1960. During 1959 and 1960 Richard and his wife maintained joint accounts in various savings and loan institutions. They made deposits and earned interest in these accounts as follows: *13 AccountNumber
Name of Savings and Loan Association
Amounts Deposited
Interest Earned
1959
1960
1959
1960
1094
Liberty
$ 1,500.00
$160.30
1715
Trident
4,000.00
80.00
$245.00
3925
Commercial
$ 4,950.00
166.03
16044
General Federal
4,000.00
151.35
18685
Supreme
40.80
25993
Alliance
78.08 4.76
29667
Northwestern
3,400.00
147.60
31321
Cragin
2,000.00
42972
Clyde
100.00
143.34
159.64
85625
Clyde
6,500.00
193.15
TOTALS $11,000.00
$15,450.00
$650.12
$919.93 Richard and his wife did not report any of this *337 interest income on their income tax returns for 1959 or 1960. In 1947, Richard graduated with an O.D. in optometry from the Monroe College of Optometry in Chicago, Illinois, and after graduation began the practice of optometry. During 1959 and 1960 he operated his business under the names of Argus Optical Company (hereinafter referred to as Argus), Leonard Optical Company, and Richard W. Chominski, Optometrist. In Illinois the treatment of eye defects is divided among dispensing opticians, opthalmologists, and optometrists. Opthalmologists examine eyes but do not sell glasses while dispensing opticians sell glasses but do not examine eyes. Optometrists both examine eyes and dispense glasses. They may be further categorized by whether or not they advertise. Richard was an advertising optometrist and promoted business by advertising every Sunday in a Chicago newspaper. Richard's business was approximately 20 percent wholesale and 80 percent retail. He used materials of first and second quality as well as close-outs and in his wholesale trade sold items at approximately 20 percent above his cost. When a customer came to Richard's office for an eye examination, Richard escorted *338 him to an examination room and referred to a patient card which he maintained for each of his customers. On the patient card, Richard recorded the patient's name and address, the date, the type of 3 glasses chosen, the total amount of the sale, the amount of deposit, and the balance due. In 1959, Richard charged $9.50 for an examination, frame, lenses and case; on Wednesdays he offered a 10 percent discount which brought the total charge to $8.55. In 1960, he extended the 10 percent discount so that it applied on Fridays also. For the retail trade Richard's usual average cost per pair of glasses was $5.65 computed as follows: Frame
$1.00
Lenses
1.00
Cutting and edging
1.00
Surfacing
2.50
Glass case
.15
$5.65
About two-thirds of all his sales required surfacing and one-third did not. In 1959 and 1960 Richard conducted many eye examinations for safety glasses for employees of a bicycle manufacturer. Richard treated receipts from these examinations as part of his wholesale business. Safety glasses required hardened lenses which added $1 to his unit cost. On his income tax return for 1959 Richard reported $10,800 as gross receipts from his optometry *339 business and subtracted $4,121.45 as cost of goods sold to arrive at a gross profit of $6,678.55. From gross profit he subtracted $2,090.23 as rent and other business expenses and calculated his net profit (and total adjusted gross income) to be $4,588.32. Similarly, in 1960 Richard reported gross receipts as $12,256, cost of goods sold as $4,902.74, gross profit as $7,353.26, rent and other business expenses as $2,084.33, and net profit (and adjusted gross income) as $5,268.93. Richard estimated his gross receipts in 1959 and 1960 by multiplying the reported cost of goods sold by two and one-half to three times. On the other hand, the rent and business expenses for 1959 and 1960 as entered on Richard's income tax returns were derived from actual figures but many expenses were apparently omitted. In 1956 and 1958 Richard had called the Internal Revenue Service and was told that he need keep business records for only three years. Thereafter he destroyed his old business records periodically and at trial did not produce adequate business records for the years in issue. However, internal revenue agents at one time had available Richard's records for 1960 and conducted an audit for *340 that year. They prepared various worksheets including one summarizing the amount of sales as shown by Richard's patient cards for 1960. For 1960, receipts as indicated by the patient cards totaled $25,173.37. [3] Petitioner testified that similar receipts for 1959 totaled approximately $23,000. During 1959 and 1960 Richard maintained a commercial checking account in the name of his wholesale business, Argus, at the Park National Bank of Chicago and deposited into that account amounts of $49,802.02 in 1959 and $35,717.90 in 1960. During 1960, Argus sold optical supplies in the amount of $7,072.12 as follows: Site 9.50 Optical Co.
$ 1,114.90
Burg Optical Co.
1,828.15
Burg Optical Service
1,820.60
Reil and Reil O.D.S.
33.00
Arnold Schwinn and Co.
1,716.12
Gabriel Optical Co.
111.85
Advance Devices 447.50 $ 7,072.12 In 1960, Richard made business *341 purchases as follows: Advance Optical
$ 196.50
American Lens
613.51
American Optical
164.13
Burgess Opticians
408.42
Bausch & Lomb
1.47
Commercial Optical
2,334.83
Dal-Tex
3.20
Gabriel Optical
8,883.41
Grace Line
214.96
Imperial Optical
2,261.72
Import Frame
1.70
Mueller Welt
149.92
Morris
63.84
Optical Development
411.24
Opticase
598.78
Van
384.00
Roosevelt Optical
2,116.06
Ragbert
134.28
Staple Rite
1,248.16
State Optical
2,154.95
Sellstrom
336.36
Windsor
207.45
Webster 165.03
$23,053.92
In 1960 Richard sustained the following business expenses: Advertising
$ 2,027.68
Rent
1,220.00
Salary
1,040.00
Electricity
263.23
Telephone
558.60
Purchases 23,053.92
$28,163.43 4 In each of the years 1959 and 1960, Richard received approximately $3,000 for preparing income tax returns for others. During 1960, he received an insurance commission in the amount of $46.93 and in 1959 received similar commissions totaling between $50 and $100. Richard deposited these items of income along with the receipts from his optometric practice at the Park National Bank. In 1960 Richard transferred money *342 between his various accounts. Three transfers in 1960 to his commercial checking account at the Park National Bank totaled $761.04. In May 1960 he made a fourth transfer of $4,950 from his commercial checking account at the Park National Bank in order to open savings account 3925 at the Commercial Savings and Loan Association in Baltimore, Maryland. In 1959 thieves stole $5,000 worth of merchandise from Richard's office, which theft was not covered by insurance. Richard placed an advertisement in a local weekly optometric journal and offered a $500 reward for information leading to the arrest and conviction of the thieves, but no recovery was ever made. Opinion Respondent has determined that petitioner failed to report substantial amounts of income in 1959 and 1960. Because petitioner (who is an optometrist) and respondent have not been able to see eye-to-eye on this determination, our primary and inherently factual task is to ascertain whether petitioner omitted any income from his tax returns for the years in issue. It is immediately clear, and petitioner makes no contention otherwise, that his business receipts were greatly in excess of what he reported. In 1959 he had gross *343 business receipts of about $50,000 but reported only $10,800 as gross receipts on his income tax return; in 1960, these figures were almost $40,000 and $12,256, respectively. However, it is equally clear that petitioner understated his cost of goods sold and deductible business expenses for both of these years. Thus, respondent's agents persued what records they had available for petitioner's 1960 expenses and compiled worksheets summarizing petitioner's purchases and other expenses for that year. Allowing for various arithmetical discrepancies we have found that those expenses totaled $28,163.43, while on his 1960 return petitioner reported only $6,987.07. As petitioner had destroyed his records for 1959, we were hard put to determine his expenses for 1959. On authority of such cases as Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2, 1930); and Zeddies v. Commissioner, 264 F. 2d 120 (C.A. 7, 1959), affirming a Memorandum Opinion of this Court, certiorari denied 360 U.S. 910 (1959), we may estimate petitioner's expenses for 1959. It is clear from the record that those expenses for 1959 were in the same range as his expenses for 1960 when his *344 gross business receipts were comparable and therefore, we find that for 1959 his cost of goods sold and deductible business expenses amounted to $25,000 as compared to the $6,211.68 which was reported and which is urged upon us by respondent. Petitioner failed to specifically report certain insurance commissions and $3,000 in each of 1959 and 1960 as remuneration for filling out income tax forms. We need make no special adjustment with respect to these items as we have found that he included them with the daily receipts from his optometric business. Petitioner has not adequately explained the source of the deposits made in certain accounts which he held jointly with his wife at various savings and loan associations. He urges us to find that the accretions to those accounts were, in large part, the result of Pearl's gifts to him for the benefit of his family. While we have found that Pearl did give him $4,000 in each of 1959 and 1960, the evidence does not justify similarly categorizing any of the other deposits. It follows, therefore, that the rest of the deposits were income to petitioner when made. The interest earned in the joint accounts held by Richard and his wife, was, *345 of course, gross income to them. Sec. 61(a)(4). Respondent contends that deposits made to accounts 2486 and 70497, which were held jointly by petitioner and his brother Alex, represented gross income to petitioner. We cannot agree. Alex testified that he made all of the contributions to these two accounts prior to and during the years in question. Therefore, if the deposits were income to anyone during 1959 and 1960, they would be so attributed to Alex. We come to a different conclusion with respect to account 29501 which petitioner 5 held jointly with Pearl. The only evidence tending to show that Pearl made any of the contributions to account 29501 was the testimony of Alex that he saw the passbook for that account in her house. However, the evidence of address changes on the passbook itself tends to show that the savings and loan association considered petitioner as the primary contributor. In the absence of any other indications we must hold that petitioner has not sustained his burden of overcoming the presumption of the correctness of the Commissioner's determination. [4]
*346 We further conclude, since petitioner made no contributions to accounts 2486 and 70497, and had no control over them, that he was not subject to tax on the interest which those accounts earned in 1959 or in 1960. [5] Our conclusion is otherwise as to account 29501 except for our consideration of imposition of the fraud penalties. In 1959, Richard sustained a theft loss of $5,000. Respondent contends that this loss is not in issue. We disagree. When filing this petition, petitioner included (as is required by Rule 7(c)(4)(E) of this Court's Rules *347 of Practice) copies of the statutory notice of deficiency. However, he did not include the statement accompanying and explaining that notice. Although the petition is ambiguous with respect to whether taxable, gross, or adjusted gross income is in issue; respondent has clarified this ambiguity in his answer by alleging and putting into issue: That the petitioners for the taxable year 1959 had in fact realized adjusted gross income and had a tax liability of $59,045.36 and $23,176.12, respectively. Section 62 defines adjusted gross income as gross income less various deductions including, in particular, certain allowable deductions attributable to a taxpayer's business. As an uncompensated theft loss attributable to petitioner's business would be one of these allowable deductions, sec. 165(a), (c)(1), (e), we must take petitioner's $5,000 loss into account in determining his adjusted gross income for 1959. Some of the stolen items were frames and lenses which would properly be a part of petitioner's inventory. Section 1.165-8(e), Income Tax Regs., provides that section 165 "does not apply to a theft loss reflected in the inventories of the taxpayer." A double deduction might otherwise *348 result. However, because of the extraordinary magnitude of this theft loss, we did not take it into account in our estimate of petitioner's cost of goods sold and deductible business expenses for 1959. Therefore, as the theft loss was not otherwise reflected in petitioner's inventories, we now note it separately. We summarize our holdings below: *13
1959
1960
Our Holding
As Returned byPetitioner
Our Holding
As Returned byPetitioner
Receipts from business
$49,802.02
$10,800.00
$35,717.90
$12,256.00
Deposits in savings and loan accounts with Genevieve
11,000.00
15,450.00
Interest income from above accounts
650.12
919.93
Deposits and interest in savings and loan accounts with Pearl 291.45
565.33
Totals
$61,743.59
$10,800.00
$52,653.16
$12,256.00
Less: Cost of goods sold, rent, and other business expenses
25,000.00
6,211.68
28,163.43
6,987.07
Theft loss not otherwise reflected in cost of goods sold and other business expenses
5,000.00
Gifts from Pearl
4,000.00
4,000.00
Inter-account transfers
5,711.04
Totals
$34,000.00
$ 6,211.68
$37,874.47
$ 6,987.07
ADJUSTED GROSS INCOME
$27,743.59
$ 4,588.32
$14,778.69
$ 5,268.93
*349 5 In determining that there were deficiencies in petitioner's income tax for the years 1959 and 1960, we have perforce determined that there existed underpayments of tax which were required to be shown on petitioner's returns for those years. See sec. 6653(c)(1). We must next decide whether any part of the underpayments of tax was due to fraud so as to subject petitioner to the 50 percent addition to tax imposed by section 6653(b). The question of whether an underpayment of tax is due to fraud is one of fact, and the burden of proof is upon respondent to establish the fraud by clear and convincing evidence. E.g., Anson Beaver, 55 T.C. 85 (October 20, 1970); Tsuneo Otsuki, 53 T.C. 96, 105 (1969). Upon careful consideration of the demeanor of the witnesses at trial and upon a lengthy examination of the entire record, we conclude that respondent has shown by clear and convincing evidence that Richard fraudulently understated his adjusted gross income. Besides the substantial size of the underpayments of tax in each year, [6] the instant case reveals several factors from which fraud may be inferred. Respondent points to such "badges of fraud" as petitioner's *350 gross understatements of business receipts, his failure to produce adequate business records, and his omission of hundreds of dollars of interest income received from ten different savings and loan accounts. Richard's explanation that he understated gross business receipts because he felt that by estimating he would come up with the actual tax, immediately raised doubt in our minds as to his motives especially in view of the otherwise sophisticated business sense he displayed at trial. The fact that Richard received remuneration of approximately $3,000 in each of the years in issue for preparing the income tax returns of others indicated *351 that he had some knowledge of the income tax laws and that he should have known better than to have relied on estimates. Further increasing the persuasiveness of respondent's argument is the fact that Richard conveniently and voluntarily destroyed his business records for both 1959 and 1960. See Nathan Goldsmith, 31 T.C. 56, 64 (1958). Finally, petitioner's failure to report the interest income from the ten savings and loan accounts which he held jointly with his wife is inexcusable in light of the particular circumstances of this case. The amount of interest income omitted for each year was large: $650.12 in 1959 and $919.93 in 1960. Petitioner failed to report the receipt of any of this income even though the first page of the Form 1040 income tax return which he completed in both of the years in issue clearly provided in boldfaced type for an accounting of such income. We cannot believe that one who has received $3,000 per year as compensation for completing the income tax returns of others would be so neglectful as to omit these relatively substantial amounts of gross income from his own income tax return. In summary, we agree with respondent that these separate *352 indications of fraud, when taken as a whole, show clearly and convincingly that petitioner intended to evade tax by submitting a fraudulent return for each of the years 1959 and 1960. Decisions will be entered under Rule 50. 6 Footnotes
1. Unless otherwise specified, all statutory references are to the Internal Revenue Code of 1954.↩
2. Alex's (and Richard's) father had died in 1944.↩
3. This sum has been stipulated but upon perusal of the worksheet we have found arithmetical errors on pages 10, 15, and 55 resulting in a total understatement of $13.60. We also noticed that the worksheet took into account certain receipts totaling $165.20 for services rendered in years after 1960.↩
4. As is indicated, infra, we have excluded these additions to petitioner's gross income from our consideration of the imposition of the fraud penalties.↩
5. The case of Helvering v. Clifford, 309 U.S. 331 (1940) and the principles it sets forth offer a close analogy to the instant situation. Alex, through his control of accounts 2486 and 70497, "retained the substance of full enjoyment of all the rights which previously he had in the property." 309 U.S. at 336. As a practical matter it appears that these joint accounts were testamentary devices to which petitioner had no direct access. Without petitioner's consent Alex could have withdrawn any or all of the funds in accounts 2486 and 70497 and could have removed those funds entirely from joint ownership.↩
6. In determining that the underpayments of tax were substantial, we have not taken into account any underpayments with respect to amounts of gross income attributable to savings and loan account 29501 which Richard held jointly with his mother, Pearl. While we have found that petitioner failed to sustain his burden of proving that the increases in that account were not gross income to him, the issue was a very close one. We felt obliged not to consider the omission of such questionable items in determining whether petitioner had committed fraud.↩