T.C. Memo. 1997-27


UNITED STATES TAX COURT


STUART AND BETSY BOBRY, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 5007-94, 5008-94,      Filed January 15, 1997.
            5009-94.


<u>Sherman F. Levey</u>, for petitioners.

<u>Raymond M. Boulanger</u> and <u>Kevin M. Murphy</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


SWIFT, <u>Judge</u>:  Respondent determined deficiencies in

petitioners' joint Federal income taxes and accuracy-related

penalties for 1989 through 1992 as follows:

---

[1]    Cases of the following petitioners are consolidated
herewith:  Harold and Terri Bobry, docket No. 5008-94; and
Michael and Doris Bobry, docket No. 5009-94.

Stuart and Betsy Bobry
Docket No. 5007-94

| Year | Deficiency | Accuracy-Related Penalty Sec. 6662(c) |
|------|-----------|---------------------------------------|
| 1989 | $991,916 | $198,383 |
| 1990 | 563,956 | 112,791 |
| 1991 | 508,406 | 101,681 |
| 1992 | 444,764 | 88,953 |

Harold and Terri Bobry
Docket No. 5008-94

| Year | Deficiency | Accuracy-Related Penalty Sec. 6662(c) |
|------|-----------|---------------------------------------|
| 1989 | $160,505 | $32,101 |
| 1990 | 260,288 | 52,058 |
| 1991 | 239,272 | 47,854 |
| 1992 | 203,619 | 40,724 |

Michael and Doris Bobry
Docket No. 5009-94

| Year | Deficiency | Accuracy-Related Penalty Sec. 6662(c) |
|------|-----------|---------------------------------------|
| 1989 | $160,505 | $32,101 |
| 1990 | 260,288 | 52,058 |
| 1991 | 238,686 | 47,737 |
| 1992 | 203,621 | 40,724 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After settlement, the issues for decision are: (1) The amount of Lyell Metal Co., Inc.'s (Lyell Metal's) cost-of-goods sold; and (2) whether petitioners are liable for the accuracy-related penalties.

FINDINGS OF FACT

Some facts have been stipulated and are so found. Petitioners resided in Pittsford, New York, when their petitions were filed.

During the years in issue, petitioners Stuart Bobry, Harold Bobry, and Michael Bobry (Harold and Michael are sons of Stuart Bobry) owned all of the stock in Lyell Metal, an S corporation, as follows:

| Year | Percentage of Stock Ownership | | |
|------|--------|--------|---------|
|      | Stuart | Harold | Michael |
| 1989 | 75.50  | 12.25  | 12.25   |
| 1990 | 52     | 24     | 24      |
| 1991 | 52     | 24     | 24      |
| 1992 | 52     | 24     | 24      |

During 1989 through 1992, Lyell Metal was engaged in the scrap metal recycling business in the vicinity of Rochester, New York. Lyell Metal purchased scrap metal from large, industrial users of scrap metal, from small businesses, and from individuals.

In the Rochester, New York, metropolitan area, much of the trade in scrap metal occurs by way of cash transactions. Industrial companies from which large quantities of scrap metal are purchased will often accept payment by check, while most small businesses and individuals from whom scrap metal is purchased accept payment only by cash.

During 1989 through 1992, Lyell Metal maintained certain books and records relating to its purchase of scrap metal by check and by cash.

With regard to Lyell Metal's purchase of scrap metal by check, Lyell Metal's books and records reflect the amount and date of the checks, the payee, the nature and quantity of scrap metal purchased, and other information regarding each transaction.

With regard to Lyell Metal's purchase of scrap metal by cash, Lyell Metal's records are not as complete as they are for the purchase of scrap metal by check. With regard to the purchase of scrap metal by cash, upon receipt in Lyell Metal's yard of scrap metal from customers, Lyell Metal's yard employees would prepare receipts in triplicate showing unit cost, total cost, metal type, and weight of scrap metal received. The customers would then present the receipts to the cashier in Lyell Metal's front office, and the cashier would pay customers in cash the amount indicated on the receipts. For each transaction, the cashier would verify the information on the receipt for accuracy, would give one of the copies of the receipt to the customer, and would retain two copies of the receipt.

During 1989 through 1992, at the end of each business day, one of Lyell Metal's office clerks would compare and verify conformity of the records of the total amount of cash that Lyell

Metal had paid out that day to purchase scrap metal (as per the retained copies of the receipts) with the cash register tape.

On the next business day, an office clerk would prepare a Lyell Metal check made payable to "cash" in the total amount of the cash that Lyell Metal had paid out on the prior business day to purchase scrap metal, would cash this check at the bank, and would place the cash received in Lyell Metal's front office cash register to replenish the cash that had been used the prior day to purchase scrap metal.

The canceled checks made payable each day to "cash" (along with Lyell Metal's other canceled checks) were returned by the bank and were retained for each year by Lyell Metal. The retained canceled checks made payable to cash represented the primary record that Lyell Metal used to keep track of its cost of scrap metal purchased by cash (along with its more complete records relating to its cost of scrap metal purchased by check). For example, Lyell Metal used the total amount of the canceled checks made payable to cash during a week as the total amount for cash purchases of scrap metal for that week. Lyell Metal's records do not reflect names, addresses, or other identifying information regarding the customers from whom Lyell Metal purchased scrap metal by cash.

During 1989 through 1992, Lyell Metal retained all of the canceled checks made payable to cash. During 1989, 1990, and through October of 1991, however, Lyell Metal retained for only 8

to 12 weeks the daily cash register tapes and the copies of the receipts reflecting Lyell Metal's purchases of scrap metal. Before the cash register tapes and the copies of the receipts were disposed of, Lyell Metal's accountant occasionally would spot check the accuracy of the receipts with the inventory records that were maintained by Lyell Metal.

Since October of 1991, Lyell Metal has retained the daily cash register tapes and copies of the receipts reflecting its purchases of scrap metal by cash. Such receipts, however, do not reflect the identity of the customers from whom Lyell Metal purchased scrap metal.

During 1989 through 1992, certain inventory records were maintained by Lyell Metal and apparently reflect only the type and quantity of scrap metal that was purchased by check and by cash and the scrap metal that was part of Lyell Metal's inventory at any one point in time.

For 1989, 1990, and 1991, Lyell Metal's cost-of-goods sold was computed based on the canceled checks (i.e., those checks made payable to specific payees to take into account scrap metal purchased by check and also the checks made payable each day to cash to take into account scrap metal purchased by cash).

For 1992, Lyell Metal's cost-of-goods sold was computed based on the copies of the receipts of scrap metal purchased that were retained for that year, and also on the canceled checks.

The receipts and canceled checks reflected the same total cash purchases of scrap metal for the year.

On some occasions, Lyell Metal paid cash for expenses unrelated to the purchase of scrap metal. For example, Lyell Metal paid cash for the services of an electrician.

On February 21, 1992, respondent requested of Lyell Metal in writing that Lyell Metal obtain, record, and retain for respondent detailed information (namely, names, addresses, Social Security numbers, and employee identification numbers) identifying the customers from whom Lyell Metal purchased scrap metal by cash. As of the date of trial, Lyell Metal has not complied with respondent's request.

Lyell Metal's Reported Gross Profit Margins, Federal Income Tax
Returns, and Respondent's Audits

Based on the evidence before us, from 1989, 1990, and 1991, Lyell Metal's gross profit margins (as reflected by gross revenue and cost-of-goods sold as reported on Lyell Metal's tax returns) exceeded the average gross profit margins of similarly sized scrap metal companies. For 1992, the record does not reflect an average gross profit margin for scrap metal companies.

For 1989 through 1991, the following schedule reflects Lyell Metal's gross revenue and total cost-of-goods sold as reported on its Federal income tax returns, Lyell Metal's gross profit margins based on the tax returns as filed, and the average gross

profit margins of similarly sized companies within the scrap metal industry:

| | Lyell Metal's Reported | | Reported Gross Profit Margins | |
|------|---------------|--------------------|-------------|------------------|
| Year | Gross Revenue | Cost-of-Goods Sold | Lyell Metal | Industry Average |
| 1989 | $20,548,908 | $14,434,001 | 29.75% | 22.3% |
| 1990 | 17,489,213 | 13,137,949 | 24.87% | 20.3% |
| 1991 | 13,222,367 | 10,094,291 | 23.66% | 21.4% |

For 1989 through 1992, Lyell Metal filed Federal income tax returns as an S corporation. For each year in issue, Lyell Metal included in its claimed cost-of-goods sold calculation purchases of scrap metal by check and by cash.

In preparing Lyell Metal's Federal income tax returns for the years in issue and in calculating Lyell Metal's cost-of-goods sold as claimed on Lyell Metal's tax returns with respect to scrap metal purchased by cash, Lyell Metal's accountant relied primarily on and used the total dollar amount of the canceled checks made payable to cash and the inventory records. For the portion of 1991 and for 1992 during which copies of the customer receipts and cash register tapes were retained, the accountant also used the retained copies of the receipts and cash register tapes that reflected purchases of scrap metal by cash.

The following schedule reflects, for 1989 through 1992, Lyell Metal's calculation of its total purchases of scrap metal by check and by cash and Lyell Metal's total cost-of-goods sold as reported on Lyell Metal's Federal income tax returns.

Lyell Metal's
Calculation of Purchases of Scrap Metal

| Year | By Check | By Cash | Total Purchases | Lyell Metal's Reported Cost-of-Goods Sold |
|---|---|---|---|---|
| 1989 | $8,813,624 | $5,637,214 | $14,450,838 | $14,434,001 |
| 1990 | 8,492,978 | 4,662,030 | 13,155,008 | 13,137,949 |
| 1991 | 6,722,992 | 3,745,733 | 10,468,725 | 10,094,291 |
| 1992 | 6,410,910 | 3,330,418 | 9,741,328 | 9,610,215 |

For 1989 through 1992, petitioners timely filed their joint Federal income tax returns reflecting the pass-through tax consequences of Lyell Metal's S corporation status.

On audit, respondent disallowed for each year for lack of substantiation approximately 83 percent of Lyell Metal's reported purchases of scrap metal by cash, and respondent determined the tax deficiencies in dispute herein based on this disallowance. The 17 percent of alleged purchases of scrap metal by cash that respondent allowed apparently reflects respondent's estimate of Lyell Metal's total cash purchases of scrap metal for amounts under $200 per transaction.

For 1992, respondent disallowed 83 percent of Lyell Metal's reported purchases of scrap metal by cash even though Lyell Metal's reported amount therefor was based not only on the canceled checks made payable to cash but also on the copies of the receipts and cash register tapes that were retained by Lyell Metal for 1992 that reflected cash purchases. Respondent's disallowance for 1992 apparently was based on the fact that the canceled checks and copies of the receipts did not contain all of

the information that respondent had requested about the identity of Lyell Metal's customers.

During the audit, respondent found no corroborating evidence of unreported income on the part of petitioners.

The following schedule reflects, for 1989 through 1992, Lyell Metal's claimed purchases of scrap metal by cash that were disallowed by respondent, and Lyell Metal's total cost-of-goods sold as redetermined by respondent.

| Year | Cash Purchases Disallowed by Respondent for Lack of Substantiation | Cost-of-Goods Sold as Redetermined by Respondent |
|------|------|------|
| 1989 | $4,641,192 | $9,792,809 |
| 1990 | 3,869,186 | 9,268,763 |
| 1991 | 3,108,958 | 6,985,333 |
| 1992 | 2,764,247 | 6,845,968 |

Respondent's adjustments to Lyell Metal's claimed cost-of-goods sold increased Lyell Metal's alleged gross income for the years in issue, and this alleged additional income was charged to petitioners' joint Federal income tax returns.

For 1989 through 1992, respondent also determined accuracy-related penalties against petitioners for negligence relating to the adjustments to Lyell Metal's cost-of-goods sold.

OPINION

In calculating gross income, taxpayers may offset gross revenue with cost-of-goods sold. Metra Chem Corp. v. Commissioner, 88 T.C. 654, 661 (1987); B.C. Cook & Sons, Inc. v.

Commissioner, 65 T.C. 422, 428 (1975), affd. per curiam 584 F.2d 53 (5th Cir. 1978). Taxpayers, generally, bear the burden of proof regarding the proper amount of their cost-of-goods sold. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Winer v. Commissioner, 371 F.2d 684, 687 n.5 (1st Cir. 1967), affg. T.C. Memo. 1966-99; Goldsmith v. Commissioner, 31 T.C. 56, 62 (1958).

Taxpayers are expected to maintain adequate records to substantiate claimed cost-of-goods sold. Sec. 6001; sec. 1.6001-1(a), Income Tax Regs. Where taxpayers do not have adequate records, but where the record suggests that they clearly incurred an offset to gross income, courts may estimate the offset based on the evidence. Cohan v. Commissioner, 39 F.2d 540, 544 (2d Cir. 1930).

Respondent argues that Lyell Metal failed to substantiate adequately its purchases of scrap metal by cash because Lyell Metal did not maintain records of specific purchases of scrap metal by cash nor records that identified the specific customers from whom Lyell Metal purchased scrap metal by cash.

Petitioners argue that Lyell Metal's records (namely, for 1989, 1990, and 1991, the canceled checks made payable to cash that were used daily to replenish Lyell Metal's front office with the amount of cash paid out the prior day to purchase scrap metal, and for 1992, copies of the retained receipts, cash register tapes, and the canceled checks made payable to cash)

adequately establish and substantiate its purchases of scrap metal by cash.  Petitioners also argue that the accuracy of Lyell Metal's reported cost-of-goods sold is supported by the average gross profit margins within the scrap metal industry.

The evidence in this case supports the basic accuracy of Lyell Metal's reported scrap metal purchases and reported cost-of-goods sold.  For all the years in issue, Lyell Metal retained its canceled checks made payable to cash and its general inventory records.  For 1992, Lyell Metal also retained copies of its receipts and its cash register tapes reflecting cash purchases of scrap metal, which records corroborate the basic accuracy of using, in this case, Lyell Metal's canceled checks made payable to cash to compute the total cash purchases of scrap metal for 1992 and thereby for the earlier years as well.

For 1989 through 1991, Lyell Metal's reported gross profit margins exceeded the average gross profit margins of similarly sized companies within the scrap metal industry.

If respondent's determinations for 1989 through 1991 were sustained, Lyell Metal would be taxed on the basis of gross profit margins that would be twice the industry average. Although the evidence indicates that Lyell Metal was a profitable company, it does not indicate that Lyell Metal was that much more profitable than other scrap metal companies, and it does not indicate that petitioners realized anywhere near the income charged to them by respondent.

Although the evidence largely supports the accuracy of Lyell Metal's reported cost-of-goods sold, the evidence does indicate that Lyell Metal did improperly include in its cost-of-goods-sold computation some expenses for non-cost-of-goods-sold items (i.e., Lyell Metal paid for some expenses by cash that were not related to the purchase of scrap metal and to that extent Lyell Metal's purchases and its cost-of-goods-sold computation was overstated), and Lyell Metal's records relating to cash purchases of scrap metal are not as complete as they should be. We do not condone Lyell Metal's failure to maintain more complete and accurate records with regard to individual purchases of scrap metal, particularly those where Lyell Metal made payment therefor by cash.

Based on the evidence before us, we hold that Lyell Metal is entitled to include 95 percent of its calculation of its purchases of scrap metal by cash as part of its cost-of-goods-sold computation for the years in issue. Cohan v. Commissioner, supra. The 5-percent reduction that we sustain is supported by the fact that Lyell Metal did include some non-cost-of-goods-sold items in its cost-of-goods sold computation for some years and by Lyell Metal's incomplete recordkeeping.

For 1989 through 1992, the following schedule reflects our computation and estimate of Lyell Metal's total purchases of scrap metal by cash, of Lyell Metal's total cost-of-goods sold,

and of the additional income to be charged to Lyell Metal and to the shareholders thereof.

| Year | Estimated Cash Purchases | Estimated Cost-of-Goods Sold | Estimated Additional Income |
|------|--------------------------|------------------------------|------------------------------|
| 1989 | $5,355,353 | $14,152,140 | $281,861 |
| 1990 | 4,428,929 | 12,904,848 | 233,101 |
| 1991 | 3,558,446 | 9,907,004 | 187,287 |
| 1992 | 3,163,897 | 9,443,694 | 166,521 |

Under section 6662(a), a 20-percent accuracy-related penalty applies to underpayments of tax attributable to either negligence or to a disregard of the rules or regulations.

Taxpayers are expected to maintain adequate records and failure to do so may constitute negligence and a disregard of rules or regulations. Sec. 6001; see also Schroeder v. Commissioner, 40 T.C. 30, 34 (1963); Bard v. Commissioner, T.C. Memo. 1990-431. Petitioners bear the burden of proof with respect to this issue. Rule 142(a).

As indicated, for the years in issue Lyell Metal failed to maintain complete records. Prior to 1991, Lyell Metal retained copies of receipts reflecting its cash purchases of scrap metal for only 8 to 12 weeks, and for all of the years in issue Lyell Metal failed to maintain any identifying information relating to customers to whom Lyell Metal paid cash for scrap metal. We sustain respondent's determination of the accuracy-related penalties.

To reflect the foregoing,

Decisions will be
entered under Rule 155.