ELLISON PHILLIPS AND VIRGINIA PHILLIPS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Phillips v. Comm'r
Docket No. 4828-78. United States Tax Court
T.C. Memo 1984-133; 1984 Tax Ct. Memo LEXIS 539; 47 T.C.M. (CCH) 1289; T.C.M. (RIA) 84133; March 19, 1984. John J. Vassen,Patrick B. Mathis, and Roger L. Vetter, for the petitioners. David T. Karzon, Jr., and Reid M. Huey, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined the following deficiencies in and additions to petitioners' *541 Federal income taxes: Year
Deficiency
[1] Sec. 6653(b) 1966
$2,379
$1,190
1967
3,284
1,642
1968
10,404
5,202
1969
6,458
3,229
This is a civil fraud case involving a claimed "cash hoard." Respondent determined petitioners' income for the years in question using the net worth-expenditures method. Because the statute of limitations precludes assessment and collection of the deficiencies unless the fraud exception (section 6501(c)(3)) applies, the principal issue for decision is whether petitioners filed fraudulent returns with the intent to evade taxes. Petitioners claim to have had a "cash hoard," their lifetime savings from their earnings and gifts from their parents, that accounts for the otherwise unexplained increases in net worth FINDINGS OF FACT Some of the facts have been stipulated and are so found. The several stipulations of facts and all exhibits attached thereto are incorporated herein *542 by this reference. Petitioners, Ellison Phillips ("Ellison") and Virginia Phillips ("Virginia"), are husband and wife and resided in Mt. Vernon, Illinois, when they filed their petition in this case. Petitioners timely filed joint U.S. Individual Income Tax Returns (Forms 1040) for the calendar years 1966 through 1969 with the Internal Revenue Service Center at Kansas City, Missouri. Ellison was born in approximately 1915. Virginia was born on October 18, 1916. Ellison and Virginia were graduated from high school in 1934 and were married in 1937. Ellison was an only child. Ellison's father, Alonzo Phillips ("Alonzo"), had jobs as a railroad employee and school teacher. Before his death in 1949, Alonzo's primary occupation was farming. Ellison's mother, Carrie Phillips ("Carrie"), was primarily a housewife; her only outside jobs were as a babysitter and ironing clothes for neighbors. After Alonzo's death, Carrie never worked to support herself. Virginia was one of three children. Until Virginia was in the fifth grade, her father, Gilbert Wente ("Gilbert"), worked as a switchman for the railroad in East St. Louis. After Virginia's family moved to Mt. Vernon, Illinois, *543 her father continued to work for the railroad except during the crop season when he worked on his farm. At some point after moving to Mt. Vernon, Gilbert worked part time at Pollock Lumber Company, making concerte blocks and worked at a bakery shop. Virginia's mother, Ethel Wente ("Ethel"), had worked in a restaurant in East St. Louis before moving to Mt. Vernon and worked in a bakery shop. She worked at a restaurant in Mt. Vernon for 10 years before she and Gilbert themselves took over operation of the restaurant. Gilbert and Ethel supported Virginia and her brother and sister during their childhood. Ellison's first employment was in 1937 at the Davidson Bakery in Mt. Vernon, Illinois, earning approximately 35 cents per hour. After that bakery burned down, he worked for bakeries in Chicago and Peoria, Illinois. Prior to 1942, Ellison was employed as a punch machine operator at the American Car and Foundry Co., receiving piecework payments of approximately $100 per week. From 1942 to 1943, Ellison was employed as a truck driver and lumber yard laborer by the Pollock Lumber Company, earning approximately $25 per week. From 1943 until 1951, Ellison was employed by Mt. Vernon *544 Distribiting Company, first as a salesman and then as a truck driver. While driving a truck for Mt. Vernon Distributing Company, he earned approximately $65 per week. [2] From 1951 until his retirement in 1972, Ellison was employed by the East Side Lumber Company in Mt. Vernon, Illinois. Between 1951 and 1959, his earnings there generally increased steadily from approximately $65 per week to approximately $100 per week. Virginia's first employment was in 1934 as an apprentice in a beauty shop and as a part-time salesperson at Woolworth's. Soon thereafter, Virginia quit her job at the beauty shop and retained her job at Woolworth's at a salary of approximately $10 per week. In 1937, petitioners moved to Chicago, where Virginia worked at a YWCA cafeteria. Petitioners rented an apartment and incurred food expenses while working in Chicago. Later they moved to Peoria and Virginia was pregnant and did not work while Ellison was employed at a bakery in that city. Petitioners' daughter, Nancy Gowler ("Nancy"), *545 was born in Peoria in 1938. Petitioners' son, Jerry Phillips, was born in 1940. During the period 1940-1947, Virginia worked for about five years doing piecework as a sleevesetter at the Mt. Vernon Garment Company. From sometime in 1947 to December 31, 1959, Virginia worked for her parents at Wente's Cafe in Mt. Vernon, earning the minimum wage throughout the period.Virginia has worked throughout her adult life except for the two short periods of time during the years 1938 to 1941, when her children were born. During the years 1943-1959, petitioners reported the following items on their Federal income tax returns: Adjusted
Medical
Gross
Sales Tax
Expenses
Year
Income
Deduction
[1] Claimed 1943
$2,214.34
$15.00
[4]
1944
2,977.42
35.00
[4]
1945
3,274.09
50.00
$269.00
1946
3,273.42
[5] 30.00
382.35
1947
Ellison
2,520.00
[5] 18.00
[4]
1947
Virginia
1,146.46
[5] 18.00
[4]
1948
2,680.00
[4]
[4]
1949
3,470.00
45.00
[4]
1950
4,863.22
75.00
359.00
1951
4,683.54
[4]
[4]
1952
5,063.31
80.00
275.00
1953
5,425.68
100.00
[4]
1954
[6] 4,701.43
75.00
522.20
1955
5,560.34
84.00
626.50
1956
5,725.40
75.00
[4]
1957
6,532.12
90.00
[4]
1958
7,083.39
105.00
[4]
1959
7,217.75
[7] 125.00
[4]
TOTALS:
$78,411.91
$1,020.00
$2,434.05
*546 Federal Income
Other
Taxes
FICA Taxes
Year
Deductions
[2] Withheld/Paid [3] Withheld/Paid 1943
$ 169.20
$53.85
[3] $22.14
1944
367.50
162.23
[3] 29.77
1945
370.50
217.11
[3] 32.74
1946
382.73
127.68
[3] 32.73
1947
Ellison
219.24
148.72
[3] 25.20
1947
Virginia
191.20
83.08
[3] 11.46
1948
[4]
[4]
[3] 26.80
1949
388.00
6.14
[3] 33.00
1950
453.50
212.08
[3] 61.17
1951
[4]
369.00
[3] 70.33
1952
526.53
451.76
73.81
1953
656.26
503.82
78.33
1954
513.66
266.32
104.68
1955
565.42
410.25
111.21
1956
603.65
649.35
114.51
1957
816.82
765.06
[3] 139.25
1958
1,007.61
837.57
139.43
1959
1,241.85
793.95
172.00
TOTALS:
$8,473.67
$6,057.97
$1,278.56
*547 Gifts and Expenditures Prior to 1960
Gifts
In 1935, for his high school graduation, Ellison's father, Alonzo, gave him a 1933 Chevrolet Coupe costing $325. In 1936, Ellison's parents purchased a home on East Hard Road near Mt. Vernon ("the East Hard Road home"). When living in Mt. Vernon during the early years of their marriage, Ellison and Virginia lived in the East Hard Road home. Although the house was titled in the names of Ellison's parents, Ellison and Virginia considered it theirs. In 1941, Ellison's parents gave petitioners three acres from their farm upon which petitioners built a home ("the Richview Drive home"). At about the same time, Alonzo and Carrie sold the East Hard Road home. Alonzo used some of the sale proceeds to pay some of the construction costs of petitioners' new home, spending at least $1,153.28 for that purpose. Much of the lumber used in petitioners' house was milled from timber cut from Alonzo's farm.Ellison did most of the construction work himself; his father helped. In 1949, after Alonzo's death, Ellison's mother, Carrie, began living with petitioners. This required remodeling their house, including finishing the upper floor *548 and adding a bathroom. Carrie paid most of the remodeling costs, spending at least $3,531.46 for that purpose. About the same time, Ellison also received as his share of his father's estate approximately $3,500 from the sale of his father's farm equipment. [3]
Carrie and Alonzo made no cash gifts to Ellison or Virginia. They did make several expenditures on petitioners' behalf, gifts of property, as indicated above. For Carrie and Alonzo, money was hard to come by and they did not have enough of it to give away. In 1948, Virginia's father, Gilbert, gave each of his children, including Virginia, new Chevrolet automobiles. Petitioners traded in their 1940 Chevrolet, with Gilbert paying the balance of $1,248.67. In 1951, Gilbert purchased for petitioners a new GMC 3/4 ton truck costing $1,600. During the early 1950's, Virginia's mother, Ethel, paid the junior high school tuition for petitioners' children. [4] During the late 1950's and early *549 to middle 1960's, Ethel also paid most of the costs of the college education of petitioners' son. Other than an amount of $500, which will be discussed below, Virginia's parents made no cash gifts to petitioners. Purchases
Before 1960, petitioners purchased the following automobiles: 1949 Chevrolet, 1950 Pontiac, 1952 Pontiac, 1955 Pontiac, 1957 Pontiac, and 1959 Ponitiac. Most of these automobile purchases were financed, and in each instance, petitioners traded in their provious car. Ellison's mother, Carrie, lived at petitioners' residence for seven or eight years after Alonzo's death in 1949. Petitioners claimed Carrie as a dependent on their Federal income tax returns for 1949 and 1950. When Carrie moved in with petitioners in 1949, she was approximately 56 years old and was not employed. On March 1, 1958, petitioners purchased a residence at 1010 Oakland Avenue in Mt. Vernon for $3,500, which they allowed Carrie to use rent free. Petitioners supported one dependent child, Nancy, during the years 1938-1939, and *550 supported two dependent children, Nancy and Jerry, during the years 1940-1955. They supported one dependent child, Jerry, during the years 1956-1961. During the 1940's and 1950's petitioners made expenditures for various imporvements, furniture, and appliances at their Richview Drive home. These items included plumbing, furnace, blocklaying and masonry, light fixtures and wiring, telephone installation, cabinet hardware, refrigerator, oil stove, kitchen table and chairs, sofa and living room chairs, throw rugs, lamps, beds, dressers and chests of drawers, dining room table and charirs, picture, and radio. Petitioners' Acquisition and Operation of the Restaurant
Virginia's parents retired from their restaurant business on January 1, 1960. At that time, petitioners acquired the restaurant and operated it as a sole proprietorship under the name of "Virginia's Cafe." When petitioners took over the restaurant, Virginia's father, Gilbert, gave her $500 to operate the cash register and to pay expenses. Petitioners always maintained $500-$600 in the cash register from 1960 until at least the end of the taxable year 1969. Virginia and Ellison tried to arrange their shifts *551 at the restaurant so that one of them would always be present. Ellison opened the restaurant at 4:00 a.m. and worked in the restaurant in the morning until he left for the lumber yard at 6:30-6:45 a.m. After he finished work at the lumber yard, he would normally return to the restaurant to assist Virginia. During the 1960's Ellison generally worked at the restaurant six days a week. The restaurant was closed on Sundays. During the period from 1960 through 1969, petitioner, Ellison, was also employed full-time at the East Side Lumber Company. Virginia managed the restaurant and was solely responsible for the restaurant's bookkeeping. Customer sales were rung up on the restaurant's cash register by the waitresses or by Ellison or Virginia. The customer guest checks were then placed on a spindle next to the cash register. At the end of each day Virginia would clear the cash register to determine daily gross receipts. Occasionally, when Virginia was not around, her father, Gilbert, would come in to clear the register, or her son, Jerry, would clear it. Ellison never cleared the cash register. Deliverymen and tradesmen were generally paid in cash out of the cash register, usually *552 by Virginia but sometimes by the waitresses.The deliverymen's or tradesmen's receipts or bills were maintained on another spindle next to the cash register, separate from the spindle for the guest checks. At the end of the day Virginia would add up the bills and receipts and write down the daily expense total, together with the daily gross receipts total, in a little notebook that she kept next to the cash register. Later, she would take the notebook paper upstairs to her office and transcribe the gross receipts and expense figures into her ledger. After Virginia recorded daily gross receipts in her ledger, she destroyed the guest checks and cash register tapes that recorded gross receipts.However, she did not destroy the bills or receipts reflecting expenses after she had recorded the daily expense figure in her ledger; instead, she stored them in an envelope. Virginia alone maintained the restaurant's books and records, essentially using the cash method of accounting. The restaurant did not accept credit cards. The restaurant had sporadic credit sales to county juries and high school athletic teams; however, these credit sales would be rung up on the register as if they had *553 been cash sales rather than waiting until actual payment. Petitioners would receive payment for these credit sales at a later date. Virginia paid her employees weekly in cash. When petitioners took over the cafe in 1960, the restaurant equipment was delapidated. The restaurant building, which Virginia's parents and at the beginning petitioners leased, was also in very poor repair. Petitioners purchased the building in 1964. During the years 1960-1965, petitioners expended the following amounts for equipment and other capital improvements for the restaurant: Amount of
Amount
Year
Purchases
Cash Purchases
Financed *
1960
$900.00
$900.00
1962
2,411.00
591.00
$1,820.00
1963
1,427.00
1,427.00
1964
23,754.00
3,242.00
20,512.00
1965
15,787.00
7,494.00
** 8,293.00
*554 Included in the 1964 expenditures is petitioners' purchase of the restaurant building for $18,000 under a contract for deed with $1,300 down, and the balance payable at six percent interest in 109 monthly payments of $200.00. The restaurant building included not only petitioners' restaurant, but the adjoining business on either side as well. Soon after acquiring the building, petitioners embarked on a major program of renovation and expansion, which Ellison and Virginia jointly planned. Throughout their ownership of the restaurant, Ellison and Virginia made joint decisions regarding equipment purchases. Throughout, Ellison did a substantial portion of the general repair and maintenance work at the restaurant. Between October 1964 and October 1965 petitioners added the "Blue Room" to their restaurant, where a beauty shop had formerly been located. The Blue Room had a seating capacity of approximately 35-40 people. Between June 1967 and April 1968 petitioners added the "Gold Room" to their restaurant, where a shoe shop had formerly been located. The Gold Room had a seating capacity of approximately 60-65 people. Between April 1968 and October 1970 petitioners remodeled the *555 "Middle Room" or "Main Room," which was the initial location of the restaurant at the time they purchased the building. Between October 1965 and October 1970 there was either construction or remodeling taking place in petitioners' restaurant on an almost continuing basis. Ellison performed nearly all of the remodeling and construction work at the restaurant.
During the years 1966 to 1969, petitioners expended the following amounts for equipment and other capital improvements for the restaurant: Year
Amount Purchased
1966
$13,549.00
1967
15,030.00
1968
23,692.00
1969
23,290.00
Cash Hoard Claim
Petitioners' Pattern of Boarrowing
Petitioners have had an excellent credit history with King City Federal Savings and Loan Association since the early 1950's. Virginia has had a charge account credit card with two department stores since 1953. On March 1, 1958, petitioners obtained a loan from King City Federal Savings and Loan Association to finance their purchase of the house at 1010 Oakland Avenue for Ellison's mother, Carrie, to use. On December 14, 1959, Ellison received a loan from the King City Federal Savings and Loan Association in the amount *556 of $4,200, bearing interest payable at 6-1/4 percent and calling for monthly payment of $42.00. The loan was secured by petitioners' personal residence on Richview Road, which was appraised at a value of $10,000. On July 30, 1965, petitioners received a loan from King City Federal Savings and Loan Association in the amount of $7,900, bearing interest at 6 percent and calling for monthly payment of $100.00. The loan was secured by petitioners' personal residence on Richview Road. Petitioners used $2,268.60 of the 1965 loan to pay off the outstanding balance on the 1959 loan. They used the balance ($5,631.40) to finance improvements at their restaurant. During the 1950's, petitioners obtained financing to purchase at least three automobiles. During the 1960's, petitioners borrowed to finance the purchase of the following authomobiles: Date of Purchase
Automobile
Amount Financed
5-15-62
1962 Chevrolet Impala
$2,270.00
Sports Coupe
4-24-63
1963 Pontiac Bonneville
2,000.00
10-17-66
1967 Pontiac Bonneville
2,000.00
10-09-67
1964 Buick Electra
1,100.00
11-25-68
1969 Pontiac Firebird
2,000.00
8-04-69
1969 Cadillac DeVille
2,000.00
By the *557 end of 1965, petitioners had an excellent credit record of long standing. Petitioners had accounts, notes, and mortgages payable in the following amounts as of the following dates: Creditor
12-31-65
12-31-66
12-31-67
12-31-68
12-31-69
King City Fed.
S&L Assn.
$ 7,554.16
$ 6,786.53
$ 5,972.03
$ 5,102.80
$ 4,213.63
Fred Lipps -
Contract for
Deed
14,889.98
13,341.21
11,697.02
9,951.36
8,098.02
Myles Talbot -
Contract
for Deed
14,000.00
General Motors
Acceptance
Corp.
2,120.25
2,176.30
3,354.50
4,277.47
3,794.55
Mercury
Acceptance
Corp.
222.40
1,916.67
916.67
Stern
Fixture Co.
583.41
2,278.34
4,472.00
9,064.70
6,427.61
Superior Loan
Co., Inc.
177.76
Thermo Fax
Sales, Inc.
169.59
Ford Hotel
Supply Co.
1,215.73
East Side
Lumber, Co.
2,148.92
871.20
3,764.49
3,141.91
Jackson
Jewelers
639.75
139.75
1,255.00
TOTAL
$27,696.88
* $28,179.64
* $31,532.19
$28,396.33
$40,930.72
*558 Petitioners incurred interest expenses in the following amounts in the following years: Year
Amount
1949
$59.50
1950
63.00
1952
61.33
1953
53.20
1955
42.00
1956
83.44
1958
176.46
1959
276.47
1960
376.55
1961
323.64
1962
252.07
1963
301.06
1964
257.00
1965
1,377.00
1966
1,532.00
1967
1,720.00
1968
1,213.00
1969
1,254.00
Petitioners' Banking Experience
The first money Ellison earned in his lifetime was $100 from the sale of a cow that his father had given him. Ellison placed the money in a bank and lost it when the bank failed during the Depression. When Ellison's parents sold the East Hard Road house in 1941, Alonzo deposited the proceeds into a bank account, from which he periodically disbursed sums to pay construction costs on petitioners' Richview Drive home. From 1949 through the 1960's Ellison's mother, Carrie, maintained a checking account with the First National Bank of Mt. Vernon. During at least part of this period, this was a joint account with Ellison. From December 29, 1960 to January 5, 1973, Virginia maintained a joint savings account with her parents, Gilbert and Ethel, at the King City *559 Federal Savings and Loan Association. Virginia made no deposits to or withdrawals from this account during the years 1965-1969. Petitioners maintained a bank checking account during the 1950's and 1960's to pay personal expenses, particularly deductible expenses. When petitioners acquired the restaurant in 1960, they opened a restaurant checking account. When they purchased the restaurant building in 1964, which included rental units, they opened a rental checking account. Petitioners also maintained savings accounts with balances in the following amounts as of the following dates: 12-31-65
12-31-66
12-31-67
12-31-68
12-31-69
King City Fed.
S&L Assn.
$3,660.57
$4,830.90
$5,056.92
$7,771.70
$13,793.01
Bank of Illinois
1,504.19
TOTAL
$3,660.57
$4,830.90
$5,056.92
$7,771.70
$15,297.20
Petitioners reported interest income from savings accounts in the following years in the following amounts: Year
Amount
1963
$48.53
1964
86.26
1965
107.00
1966
170.00
1967
226.00
1968
215.00
1969
525.00
During the years 1966-1969, petitioners maintained a safe deposit box at the Security Bank & Trust Co.
*560 Nontaxable Sources During the Years in Issue
Petitioners did not receive any inheritances or life insurance proceeds during the years in issue. Petitioners received no gifts in amounts that would affect respondent's determinations during the years in issue. Coin and Currency Collection
Through 1970, Ellison was actively collecting coins and currency. Ellison did not sell any of the coin and currency at a profit during the years 1966-1969. Petitioners never counted the coin and currency collection. They do not know and are not able to estimate the value of this collection as of the end of any of the years here in issue. Preparation of Tax Returns
Conrad J. Hoit ("Hoit") prepared petitioners' Federal income tax returns for the years 1966 through 1969.Petitioners furnished Hoit with annual summaries of gross receipts and expenses from the restaurant that Virginia had prepared.Petitioners never showed Hoit the ledger in which gross receipts and expenses were entered on a daily basis, and never showed him any cash register tapes or guest checks reflecting sales. On some occasions Ellison furnished Hoit with the income tax information that Virginia had prepared; *561 on others, Virginia did so. Sometimes Ellison picked up the completed tax return from Hoit; sometimes Virginia picked it up. After Hoit completed a return, he would discuss with petitioners how much tax was owed and when it was due. Hoit prepared petitioners' returns for the years 1966-1969 using the cash method of accounting. Gross Profit Ratio Comparison
The following is a comparison for the years 1966-1969 of the gross receipts, cost of food sold, and gross profits from Virginia's Cafe, as reported on petitioners' returns as filed (adjusted for sales taxes) and as adjusted by respondent in his statutory notice: Return as Filed
Return Adjusted Per S/N
1966
Gross Receipts
$102,284 $111,223 Cost of Food Sold
(55,735)
(55,735)
Gross Profit
$ 46,549 $ 55,488 Gross Profit Percentage
45.5%  49.9%  1967
Gross Receipts
$102,365 $117,302 Cost of Food Sold
(51,219)
(51,219)
Gross Profit
$ 51,146 $ 66,083 Gross Profit Percentage
50.0%  56.3%  1968
Gross Receipts
$133,684 $171,471 Cost of Food Sold
(71,472)
(71,427)
Gross Profit
$ 62,257 $100,044 Gross Profit Percentage
46.6%  58.3%  1969
Gross Receipts
$155,182 $174,536 Cost of Food Sold
(69,305)
(69,305)
Gross Profit
$ 85,877 $105,231 Gross Profit Percentage
55.3%  60.3%  *562 For calendar years 1960 through 1965, petitioners reported gross receipts (adjusted for sales taxes), cost of food sold, and gross profit from their restaurant as follows: 1960
1961
1962
1963
1964
1965
Gross Receipts
Per Return
$30,523 $32,915 $39,116 $47,397 $57,307 $86.380 (Sales Tax)
(1,046)
(1,214)
(1,514)
(1,826)
(2,148)
(3,305)
Gross Receipts
(Adjusted)
29,477 31,701 37,602 45,571 55,159 83.075 Cost of Food Sold
(16,267)
(17,741)
(19,707)
(24,550)
(29,847)
(44,555)
Gross Profit
$13,210 $13,960 $17,895 $21,021 $25,312 $38,520 Gross Profit
Percentage
44.8%  44.0%  47.6%  46.1%  45.8%  46.4%  For calendar years 1970 and 1971, petitioners reported gross receipts (adjusted for sales taxes), cost of food sold, and gross profit from their restaurant as follows: 1970
1971
Gross Receipts Per Return
$176,634 $186,934 Sales Tax
(8,291)
(8,795)
Gross Receipts as Adjusted
$168,343 $178,139 Cost of Food Sold
(71,085)
(71,037)
Gross Rpofit
$ 97,258 $107,102 Gross Profit Percentage
57.8%  60.1%  *563 Conduct of Audit
On February 27, 1970, Revenue Agent Kenneth Smith ("Smith"), was assigned to examine petitioners' return for the taxable year 1968. Smith's first interview with Virginia took place on March 6, 1970 at Virginia's Cafe. Smith asked Virginia about cash on hand (both in the restaurant and elsewhere), nontaxable sources of income, recordkeeping procedures for restaurant gross receipts, depreciation schedules, liabilities, and bank accounts, among other topics. After the March 6, 1970 interview, Smith made various third-party contacts, including the tax return preparer (Hoit), banks, and vendors of petitioners' restaurant assets. During her March 6, 1970 interview with Smith, Virginia admitted that the only cash petitioners had besides the $500-$600 in the restaurant cash register was several large oversized bills or dollar bills and that otherwise, petitioners did not have any additional cash, either in their safe deposit box or personal residence or anywhere else. She also stated that petitioners did not have a buried tin can full of cash and that petitioners had never received large amounts of gifts nor any gifts other than Christmas or birthday or similar *564 gifts in small amounts.
Smith interviewed Virginia a second time on March 13, 1970 at Virginia's Cafe. Smith reviewed with Virginia various records he had obtained from third parties and again inquired about cash on hand. During the March 13, 1970 interview with Smith, Virginia told him that petitioners did not have a buried tin can full of cash, and that they carried only enough cash on their persons as was required to get by. On March 25, 1970, Smith notified Virginia that the investigation would also cover taxable year 1967. Smith again interviewed Virginia on April 9, 1970 at Virginia's Cafe. Smith advised Virginia about the apparent discrepancy that he had discovered between petitioners' increases in net worth and reported income, and again asked about the possible existence of a cash hoard. At her April 9, 1970 interview with Smith, although suggesting a cash hoard saved from petitioners' lifetime earnings as the source of any increases in net worth and expenditures in excess of their reported taxable income, Virginia admitted that she did not know where the cash accumulation could have been or where it could have been kept.She again denied the petitioners had a buried *565 tin can full of cash. On April 15, 1970, Special Agent James Wehrheim ("Wehrheim") of the Criminal Investigation Division was assigned to investigate petitioners' tax liability along with Smith. On May 12, 1970, Wehrheim and Smith interviewed Virginia at the restaurant. They discussed with her the apparent discrepancy between the examination results and petitioners' returns; petitioners' method of return preparation; the operation of the restaurant business, including recordkeeping procedures; bank accounts; loans and other nontaxable sources of income; and cash on hand. Virginia again told the agents that she kept $500 to $600 for the cash register at the restaurant. When pressed by the agents about other cash kept at other locations, she initially indicated that she did not care to answer that question but later stated she never had any large accumulatioh of cash in substantial amounts such as $5,000, $10,000, $20,000, $30,000, or $50,000. She also denied having received any large gifts or inheritances. She denied having a cash hoard. After the May 12, 1970 interview, Wehrheim contacted financial institutions, vendors of assets, employees of the restaurant, and various other *566 third parties. As of May 13, 1970, the investigation had been expanded to cover taxable years 1966 and 1969. On May 13, 1970, petitioners executed a Power of Attorney authorizing John J. Vassen ("Vassen"), attorney at law, to represent them before the Internal Revenue Service with respect to taxable years 1966, 1967, 1968, and 1969. At the May 12, 1970 interview, Wehrheim had scheduled a tentative appointment with Virginia for the morning of May 13, 1970. However, Vassen subsequently called Wehrheim's supervisor to cancel this intervier. On February 12, 1971, Wehrheim telephoned Vassen, asking to interview Ellison and Virginia. Vassen responded that he wished to consult with petitioners before responding to this request. On March 8, 1971, Vassen telephoned Wehrheim, advising Wehrheim that he wanted petitioners to work with his accountants before he would decide whether petitioners could be interviewed. Ultimately, Vassen did not allow Wehrheim to interview Ellison and Virginia because it was Vassen's policy to not allow his clients to talk to a special agent. In May of 1973, Virginia was acquitted of criminal charges of tax evasion with respect to the years 1967 and 1968. *567 Petitioners did not advise their attorney of the existence of their claimed cash hoard until immediately prior to Virginia's criminal trial in May 1973, although Vassen had been representing them since May 13, 1970. No one from IRS interviewed or examined Ellison before Virginia's 1973 criminal trial. On September 16, 1974, Revenue Agent Arlen Lash ("Lash") and Smith attended a conference at Vassen's office. Petitioners attended a portion of the conference, and were in an adjoining room for the remainder of the conference. When petitioners were present, the revenue agents specifically asked them about the alleged cash hoard. Petitioners then stated that the alleged cash hoard had been given to them before the years in issue (1966-1969) by their respective parents. On March 17, 1977, Lash and Revenue Agent Richard Faulk interviewed Ellison's mother, Carrie, at her residence in Mt. Vernon. They asked Carrie whether she or her husband, Alonzo, had ever made any cash gifts to Ellison or Virginia, and she said no. Carrie died on June 23, 1977. Wehrheim and Lash interviewed Virginia's father, Gilbert, three times on May 3, 1979 at his residence in Mt. Vernon. At the first *568 interview, Gilbert was asked whether he had given Virginia any money at the time that he turned over the restaurant to her, and whether he or his wife had ever given Virginia any cash.Wehrheim then prepared an affidavit containing Gilbert's responses. Wehrheim read the affidavit to Gilbert, and Gilbert signed it under oath. A short time later on the same day, Wehrheim and Lash returned to Gilbert's residence and asked some additional questions about cash gifts his wife, Ethel, may have made to Virginia or Ellison. Wehrheim then prepared an addendum to the original affidavit containing Gilbert's responses. Mr. Wehrheim read the addendum to the affidavit to Gilbert, and Gilbert initialed it under oath. Later on the same day, Wehrheim and Lash again returned to Gilbert's residence and asked whether he had helped Ellison and Virginia pay family expenses. Wehrheim then prepared an affidavit containing Gilbert's responses. Wehrheim read the affidavit to Gilbert, who indicated that it was correct. Gilbert stated that he would not sign the affidavit because he did not want to cause his children any trouble. Lash did not make any adjustments to cash on hand or any other part of his *569 net worth computation as a result of Gilbert's responses at the May 3, 1979 interviews. [5]
Respondent's agents adequately investigated all leads identified by petitioners concerning their alleged cash hoard. In his statutory notice of deficiency, dated February 16, 1978, respondent determined petitioners' income using the net worth-expenditures method. Petitioners have stipulated to all of the items in respondent's net worth expenditure computation except for five items: (1) cash on hand; (2) coin and currency collection; (3) food/outside meals expenditures; (4) personal expenditures (barber, beauty shop, etc.); and (5) miscellaneous personal expenses per cancelled checks. Accordingly, the table shown below *570 separately indetifies only the disputed items: ASSETS
12-31-65
12-31-66
12-31-67
Stipulated Assets
$68,449.98 $85,051.61 $106,100.77 Cash on Hand
600.00 600.00 600.00 Coin/Currency
Collection
1,600.00 1,600.00 1,600.00 Total Assets
$70,649.98 $87,251.61 $108,300.77 Stipulated Total
Liabilities
($32,429.88)
($36,417.64)
($ 45,030.19)
Net Worth
$38,220.10 $50,833.97 $ 63,270.58 Net Worth, Beginning
of Year
(38,220.11)
(50,833.97)
Increase in Net Worth
$12,613.86 $ 12,436.61 Adjustments: Stipulated Expenditures
9,644.23 9,810.66 Food/Outside Meals
1,095.00 1.095.00 Personal (Barber, etc.)
260.00 260.00 Other Misc./Personal Ex-
penses per Cancelled
Checks
787.14 834.45 Total Adjustments
$11,786.37 $12,000.11 Less U.S. Income Tax Refunds
(12.46)
Adjusted Gross Income
$24,400.23 $24,424.26 Itemized Deductions Per
Return, Adjusted to Resp.
Redetermined AGI
(2,817.00)
(2,411.00)
Less Personal Exemptions
(1,200.00)
(1,200.00)
Taxable Income (Rounded
to Whole Dollar)
$20,383.00 $20,813.00 Taxable Income Per Return
* (11,435,00)
(5,876.00)
Unreported Income
$ 8,948.00 $14,937.00 *571 ASSETS
12-31-65
12-31-68
12-31-69
Stipulated Assets
$68,449.98 $140,041.61 $183,415.99 Cash on Hand
600.00 600.00 600.00 Coin/Currency
Collection
1,600.00 1,600.00 1,600.00 Total Assets
$70,649.98 $142,241.61 $185,615.99 Stipulated Total
Liabilities
($32,429.88)
($ 49,679.33)
($ 72,043.72)
Net Worth
$38,220.10 $ 92,562.28 $113,572.27 Net Worth, Beginning
of Year
(63,270.58)
(92,562.28)
Increase in Net Worth
$ 29,291.70 $ 21,009.99 Adjustments: Stipulated Expenditures
** 8,924.00 10,413.41 Food/Outside Meals
1,095.00 1,095.00 Personal (Barber, etc.)
260.00 260.00 Other Misc./Personal Expenses
per Cancelled
Checks
943.84 2,355.93 Total Adjustments
$ 11,222.84 $ 14,124.34 Less U.S. Income Tax Refunds
(1,000.00)
Adjusted Gross Income
$ 40,514.54 $ 34,134.33 Itemized Deductions Per
Return, Adjusted to Resp.
Redetermined AGI
(3,201.56)
(3,797.23)
Less Personal Exemptions
(1,200.00)
(1,200.00)
Taxable Income (Rounded
to Whole Dollar)
$ 36,113.00 $ 29,137.00 Taxable Income Per Return
(9,783.00)
Unreported Income
$ 36,113.00 $ 19,354.00 *572 Thus, based on the above computations, respondent determined that petitioners had unreported income for each of the years 1966 through 1969 and that the resulting underpayments of tax were due to fraud with intent to evade taxes. ULTIMATE FINDINGS OF FACT 1. Petitioners had no cash hoard on December 31, 1965 or at any other time pertinent to this case. 2. Petitioners understated their taxable income and underpaid their taxes in each of the years 1966 through 1969.
3. The underpayment of tax each year was due to fraud with intent to evade taxes on the part of petitioner Virginia Phillips. OPINION
*573 This is a fraud case involving a claim of a "cash hoard." Using the net worth-expenditures method, respondent determined that petitioners omitted substantial amounts of taxable income each of the years before the Court. Respondent also determined that petitioners' omissions of taxable income and the resulting underpayments of tax were due to fraud and, accordingly, determined that petitioners were liable for the fraud addition under section 6653(b).
Petitioners bear the burden of showing that respondent's determinations of the deficiencies are incorrect. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Respondent, however, has the burden of establishing by clear and convincing evidence the elements of the fraud for the section 6653(b) addition.Sec. 7454; Rule 142(b); Stone v. Commissioner,56 T.C. 213, 220 (1971). Furthermore, here the statute of limitations precludes respondent's assessment and collection of the deficiencies he has determined unless respondent proves that petitioners' returns were false or fraudulent with the intent to evade *574 tax so that the tax may be assessed "at any time" under section 6501(c)(1). [6] In this regard, the elements of the fraud under section 6501(c)(1) for limitations purposes are essentially the same as the elements of the fraud under section 6653(b)[7] for the 50 percent civil fraud addition for any "underpayment" of tax "due to fraud." Tomlinson v. Lefkowitz,334 F. 2d 262 (5th Cir. 1964), cert. denied 379 U.S. 962 (1965); Estate of Temple v. Commissioner,67 T.C. 143, 159-160 (1976); McGee v. Commissioner,61 T.C. 249, 256-257, 261 (1973), affd. 519 F. 2d 1121 (5th Cir. 1975); Amos v. Commissioner,43 T.C. 50, 55 (1964), affd. 360 F. 2d 358 (4th Cir. 1965). [8] Moreover, in a case such as this where the fraud allegations are inextricably intertwined with the alleged omissions of income--both depending upon the accuracy of respondent's net worth determinations--we must be extremely careful so that we do not bootstrap a finding of fraud upon a taxpayer's failure to carry his burden *575 of proof with respect to the underlying deficiencies. See Drieborg v. Commissioner,225 F. 2d 216, 218 (6th Cir. 1955), affg. in part a Memorandum Opinion of this Court; Estate of Beck v. Commissioner,56 T.C. 297, 363 (1971); Otsuki v. Commissioner,53 T.C. 96, 106 (1969). See also George v. Commissioner,338 F. 2d 221, 223 (1st Cir. 1964); Reis v. Commissioner,1 T.C. 9, 13 (1942), affd. 142 F. 2d 900 (6th Cir. 1944). [9] Accordingly, we need not, and indeed should not, address the correctness of the underlying deficiencies unless and until we find that respondent has carried his burden of establishing fraud, i.e., has established by clear and convincing evidence that (1) there was an underpayment [10] of tax, and (2) some part of such underpayment of tax each year was due to fraud. *576 Under the terms of section 6653(b), as it read during the years involved in this case, the fraud addition attaches to the entire deficiency even though only a portion of the underpayment is due to fraud. Mensik v. Commissioner,328 F. 2d 147, 150 (7th Cir. 1964), cert. denied 379 U.S. 827 (1964), cert. denied 389 U.S. 912 (1967), affg. 37 T.C. 703 (1962); Johnson v. United States,94 Ct. Cl. 345, 39 F. Supp. 103 (1941). See also Breman v. Commissioner,66 T.C. 61 (1976). See also Stewart v. Commissioner,66 T.C. 54 (1976). The language of section 6653(b)--"any part of any underpayment"--presupposes the existence of an underpayment. Absent an underpayment, there is nothing to which the fraud addition may attach. Sec. 6653(b). See Jenkins v. United States,313 F. 2d 624, 627 (5th Cir. 1963). [11] Consequently, the existence of an underpayment is an element of the fraud that respondent must establish. See Hebrank v. Commissioner,81 T.C. 640, 642 (1983); Goodwin v. Commissioner,73 T.C. 215, 226-227 (1979); Considine v. Commissioner,68 T.C. 52, 68 (1977). *577 Although respondent need not prove the precise amount of the underpayment of tax, nonetheless, he still must prove that petitioners have, to some extent, underpaid their taxes. To prove that petitioners understated the taxable income and underpaid the taxes required to be shown on their returns, respondent relies upon his redetermination of petitioners' income under the net worth-expenditures method. Although the net worth-expenditures method is an acceptable mechanism for testing the accuracy of a taxpayer's tax returns, its use requires the exercise of "great care and restraint." Holland v. United States,348 U.S. 121, 129 (1954). [12] An essential condition to our acceptance of respondent's use of this method is his establishment "with reasonable certainty" of an opening net worth to serve as a starting point. Holland v. United States,supra at 132. The *578 net worth-expenditures method is not an accounting system, but rather, when properly applied, is evidence of income. Holland v. United States,supra at 130, 133; Lipsitz v. Commissioner,21 T.C. 917, 931 (1954), affd. 220 F. 2d 871 (4th Cir. 1955). Here, the parties have stipulated to all but five of the items in respondent's net worth and expenditures computation. The five items in dispute are as follows: (1) cash on hand, (2) coin and currency collection, (3) food/outside meals expenditures, (4) personal expenditures (barber, beauty shop, etc.), and (5) miscellaneous personal expenses per cancelled checks. First, as to the coin and currency collection, we accept the figure respondent has determined. Petitioner's collection did not decrease in value during the years in issue, and respondent's net worth computation determines a uniform figure of $1,600, both in the opening net worth and the ending net worth for each of the years in issue. Ellison's testimony indicates that the coin and currency collection in fact increased in value over these years, *579 which would exacerbate rather than mitigate respondent's determination of unreported income. By using a uniform value for this item, respondent eliminates the coin and currency collection as a source of his determined increase in petitioners' net worth, and this would be true even if the actual value of petitioners' coin and currency collection was much higher. Any error by respondent in this regard benefits rather than prejudices petitioners. Likewise, for purposes of determining whether respondent has proved an underpayment, we exclude his determinations for the items "food/outside meals" and "personal expenditures (barber, beauty shop, etc.)." Respondent's revenue agent admitted that these figures were merely seat-of-the-pants estimates at $3.00 per day and $5.00 per week, respectively. Respondent offered no evidence of petitioners' actual expenditures for these items, and his mere estimates do not establish these expenditures by clear and convincing evidence. Finally, in determining whether respondent has proved an underpayment, we exclude the expenditure item "other miscellaneous/ personal expenses per cancelled checks." Although the parties stipulated to summaries of petitioners' *580 personal checks for the years in issue, they did not stipulate to the characterization of any particular check. Respondent has pointed to nothing in the check summaries to establish the amounts he has determined, and, from our own analysis of those summaries, we cannot verify those amounts. Even excluding the items discussed above, however, the stipulated items and cash on hand item in respondent's net worth/ expenditures computation show the following amounts of net worth increases and expenditures: 1966
1967
1968
1969
Unaccounted for increases
in net worth and expendi-
tures, as determined by
respondent
$8,948.00 $14,937.00 $36,113.00 $19,349.00 Less items respondent has
failed to prove
(2,142.14)
(2,189.45)
(2,298.84)
(3,710.93)
Net increase
$6,805.86 $12,747.55 $33,814.16 $15,638.07 These amounts are either unreported income, as determined by respondent, or represent invasions of a cash hoard, as claimed by petitioners. Consequently, to establish an underpayment, respondent must establish the accuracy of his determinations of petitioners' cash on hand at each stage of his net worth computation. Put differently, *581 respondent must negate petitioners' claim of a cash hoard, and must do so by clear and convincing evidence. Petitioners contend that the increases in net worth and expenditures unaccounted for by their reported taxable income are attributable to a cash hoard. They argue that they accumulated this cash hoard over many years from savings from their earnings made possible by a frugal lifestyle and from gifts from their respective parents. They claim that their cash hoard reached its zenith of approximately $70,000 to $80,000 at the time they took over the restaurant in 1960, that it stayed relatively stable until the beginning of 1966 and then was largely spent during the years in issue. Respondent, of course, attributes these increases in net worth and expenditures to unreported taxable income. We begin by noting that some people do accumulate cash.We also accept that some people may choose an extremely frugal lifestyle in order to accumulate cash. However, we are satisfied that petitioners did not have a cash hoard. Their cash hoard stories are simply riddled with inconsistencies and implausibilities, and are not supported by the objective evidence in the record. Petitioners' *582 story of their claimed hoard, in its present form, is really two separate cash hoards--Ellison's and Virginia's. They testified they each kept a separate cash hoard and that, by the end of 1959, Ellison had approximately $50,000 to $55,000 and Virginia had approximately $20,000 to $30,000. By their own admission, these figures are mere estimates. Their claimed cash hoard curiously coincides with the amounts of unreported income determined by respondent, which is by no means unusual in this kind of after-the-fact fabrication of a cash hoard story. At Virginia's criminal trial in 1973, Ellison testified that the largest cash hoard petitioners ever amassed totalled $55,000 and that this included Virginia's cash hoard. The record does not explain the inflation of their alleged cash hoard by $15,000 to $25,000 in this civil tax audit and this Court proceeding. Moreover, at Virginia's 1973 criminal trial, Ellison testified that $50,000 of the cash hoard was still in existence at the end of 1969. Ellison's explanation at the Tax Court trial, that he thought the questioning at Virginia's criminal trial was referring to 1959 rather than 1969, is wholly unconvincing. There were six specific *583 references to the year 1969 in that portion of the criminal transcript, including one question by Virginia's counsel. If $50,000 of the alleged cash hoard was still in existence at the close of their last taxable year in issue, obviously, it had not been spent and thus could not account for the unexplained increases in net worth and expenditures. Even more striking is the testimony of both Ellison and Virginia that they never counted their respective cash hoards and never knew at any given time how much money they had. Generally, one would think that people who hoard cash would know precisely how much money they have at any given point in time. It simply defies belief that without knowing how much money they had, petitioners--self-described as prudent, frugal, conservative business people--relied upon their cash hoard both for their personal financial security and finance the expansion of their business. [13]
*584 Virginia's claim to have accumulated cash is also contradicted by her many statements to respondent's examining agents back in 1970. While Virginia at times declined to answer questions about cash accumulations, nevertheless, on several occasions she denied the existence of a cash hoard. Moreover, in her interview with respondent's criminal investigator, Special Agent Wehrheim, Virginia specifically denied that she had ever accumulated cash in amounts as large as $5,000 to $50,000. At trial, Virginia simply professed a lcak of memory; she never denied making the statements. Virginia's rationalization that she thought the agents were inquiring only about cash she kept at the restaurant is totally unavailing. The specific context of this questioning was accumulations of cash at places other than the restaurant, such as their home or a safe deposit box. Other inconsistencies also appear. Although both Virginia and Ellison testified to carrying part or all of their cash hoards with them, in amounts from $20,000 to 50,000, Virginia told Revenue Agent Smith that the only cash she and her husband carried was just what they required to get by. Ellison and Virginia contradicted *585 each other at trial. Ellison testified that Virginia kept her cash hoard all together, while Virginia testified that she kept part of her cash hoard in a wallet and part in a zippered pouch. The daughter presented a third scenario, testifying that the cash hoard was kept in jars or crocks hidden in an area of the basement of the family home. Petitioners' explanation for their "accumulation" of their lifetime savings in cash is equally unpersuasive. Both petitioners claim to have saved cash because of their distrust for banks. Ellison lost his first $100 earnings in a Depression bank failure and claims his father admonished him to learn from his mistake and keep his money out of banks. However, within a few years, Ellison's father himself had apparently overcome his "distrust" of banks when he placed the proceeds of his sale of the East Hard Road home into a bank account (from which he disbursed funds that petitioners spent to construct their present home). From at least 1949 through the 1960's, Ellison's mother, Carrie, maintained a checking account that was a joint account with Ellison for at least part of the period. Similarly, Virginia claims that her accumulation of savings *586 in cash was attributable to what she learned from her mother, implying that her mother also saved cash and distrusted banks. However, Virginia maintained a joint savings account with her parents from 1960 to 1973, funded exclusively by her parents.Petitioners' argument that these joint accounts with their respective parents were simply to ease payment of bills and to facilitate the transfer of property upon death misses the point entirely--people who distrust banks do not start trusting banks simply because they want to do some simple estate planning and pay bills. Moreover, petitioners themselves have used banks extensively. Since the early 1950's, they have had a checking account from which they paid personal expenses, particularly deductible expenses. They opened an additional checking account when they took over operation of the restaurant and, when they purchased the building in 1964, opened a third checking account for the rental apartments.They have had savings accounts since the early 1960's. Ellison's testimony exhibited an awareness of the FDIC protections of bank account savings. Nonetheless, when asked why he did not put his hard-earned life's savings into banks *587 when loss from a bank failure was no longer a possibility, he was typically unresponsive, stating that he chose not to, that it was his prerogative not to. It is the Court's prerogative not to believe him, and the Court, after carefully observing his demeanor and questioning him, found his testimony completely unbelievable. Finally, we note that petitioners' savings account balances and savings accounts interest were steadily rising during the period in which they claimed to have been depleting their cash hoard. Petitioners' testimony about their alleged cash hoard was at times flippant, often unresponsive, and generally uncredible and wholly unworthy of belief. Second, petitioners' extensive pattern of borrowing money, particularly during the taxable years in issue, is also a factor strongly indicating that they had no cash hoard. See Davis v. Commissioner,239 F. 2d 187, 190 (7th Cir. 1956). [14] It is particularly notable that during the taxable years in issue, when petitioners claimed to have been depleting their cash hoard, their outstanding indebtedness increased from over $27,000 to almost $41,000, most of which represented debts related to the restaurant. *588 Even before 1960, petitioners had a regular, steady, and increasing history of borrowing money to finance purchases, particularly their purchases of automobiles, and of paying interest. Their frequent, regular borrowing during the taxable years in issue is quite substantial, both in relation to their reported income and to their total assets. Petitioners' various explanations of why they chose to borrow rather than spend their alleged cash hoard are unconvincing to say the least. Virginia originally claimed that they began borrowing in order to establish a good credit rating for their business, but she conceded that well before the beginning of 1966 petitioners already possessed an excellent credit rating. The testimony of Guy Wood, an officer at the bank where petitioners refinanced their home to finance the business expansion in 1964, *589 also corroborates their excellent credit record. Virginia's next explanation was that they chose to borrow because the interest was deductible. At least until marginal tax rates exceed 100 percent, a taxpayer is always worse off financially by paying interest, even though deducted, than by not paying such interest, particularly if at the same time there is a cash hoard that is not earning any interest at all. For persons such as petitioners who describe themselves as tight conservative penny-pinchers striving to save every possible cent, this "borrow-because-the-interest-is-deductible" attitude is truly remarkable. Virginia's final "explanation," that it was her prerogative to borrow rather than spend the cash hoard, was again flippant, unresponsive, and wholly uncredible. While some particularly miserly persons might keep a cash hoard in a wallet, pouch, or glass jar without investing it or depositing it in a government-insured savings account, it defies all logic to suggest they would do so while at the same time borrowing money and paying interest on borrowed funds. The Court simply does not believe petitioners' testimony as to their reasons for borrowing. Next, we *590 do not believe petitioners' testimony about the sources of their alleged cash hoard. We have found as a fact that Ellison's parents made no cash gifts to petitioners. This finding is based primarily upon the statement of Carrie Phillips, Ellison's mother, to respondent's revenue agent shortly before Carrie's death in 1977. Moreover, from the evidence of record, we are satisfied that Ellison's parents did not have the resources to make $20,000 in cash gifts, as petitioners claims. Similarly, we do not believe that Virginia's parents gave petitioners money either.From the record, we are satisfied that Virginia's parents did not have the financial resources to make such gifts. We do not believe that Virginia's parents were giving her cash gifts at the same time they were paying her the bare minimum wage to work in their restaurant, particularly since wages would be a deductible business expense. Indeed when Virginia's parents gave up control of the business in 1960, the restaurant equipment was dilapidated. It is most unlikely that the frugal Gilbert and Ethel Wente would choose to make gifts to petitioners while their restaurant, the source of their livelihood, had fallen into *591 disrepair and needed fixing up. Moreover, the pattern of gifts from petitioners' respective parents, set out in detail in our findings of facts, confirms that there were no cash gifts other than the one discussed below. Each gift was either a specific gift of property or a specific expenditure on behalf of petitioners. In most instances, these gifts were for traditional items of family support--housing and tuition for petitioners' children. It is also unlikely that petitioner' parents would be helping with petitioners' basic family support expenses if at that time petitioners were accumulating large sums of cash. Another factor undermining gifts from petitioners' respective parents as a source of their alleged cash hoard is petitioners' inability to testify regarding the amounts and occasions of any such cash gifts. While we acknowledge that the gifts are alleged to have occurred for the most part in the 1940's and 1950's, and that people generally do not keep accurate records of receipt of gifts, nonetheless, we find it inconceivable that, with the exception of the cash gift of $500 from Virginia's father when petitioners took over the restaurant in 1960, petitioners cannot *592 remember a single amount or a single occasion of a gift from either set of parents.This is even more remarkable in light of Ellison's stipulation that he never received any single gift of cash from his father in excess of $500 and his assertion that he received a total of over $20,000 from his parents. As to the other purported source of petitioners' claimed cash hoard, the record fully establishes that petitioners could not have saved the amounts claimed from their earnings before 1960. As detailed in our findings of fact above, from 1943 through 1959 petitioners reported a total of $78,411.91 in adjusted gross income.From petitioners' testimony, as recited in the findings of fact, their earnings between 1937 and 1942 would have totalled somewhere between $10,000 and $15,000 for that six-year period, giving them a total gross income in round figures of $88,000 to $93,000 for the entire period from 1943 through 1959. Reducing this amount by the amounts claimed on petitioners' tax returns for the years 1943 to 1959 that represent cash expenditures--sales taxes, medical expenses, other cash expense deductions, Federal income taxes and FICA taxes--leaves available funds of approximately *593 $69,000 to $74,000. Theoretically, petitioners could have accumulated their cash hoard out of this by saving virtually every penny they earned for 22 years. Such a pattern of savings is extremely improbable for anyone, and the evidence of record shows a pattern of spending by petitioners during those years that used up most, if not all, of their theoretically available funds. For all but two years between 1943 and 1959, petitioners claimed deductions for sales taxes.Using the sales tax rates in effect in Illinois during those years and extrapolating from the claimed deductions, a total of $43,312 in expenditures subject to the Illinois sales tax were necessary to require payment of the sales taxes shown. (See Appendix, infra.) [15] Such expenditures would reduce petitioners' available cash to between $26,000 and $31,000. Petitioners argue that the sales tax deductions claimed are merely estimates and do not accurately reflect petitioners' taxable expenditures. However, we feel the sales tax estimates would be reasonably close to the actual taxable expenditures. We will not presume that petitioners deducted such sales taxes for 14 of 16 taxable years without incurring the *594 sales taxes so claimed. Even an overstatement of 33 percent would still leave total expenditures subject to sales taxes of $32,484, reducing their available cash to between $37,000 and $42,000. This does not include expenditures on purchases subject to sales tax during the years 1937-1942, because no evidence or other information was introduced with respect to those years, or for the years 1948 and 1951, because the returns for those years did not report itemized personal deductions. Moreover, this does not account for petitioners' actual expenditures not subject to the sales tax, such as services relating to improvements and repairs on their new Richview home, expenditures for telephone and utility expenses, tuition, auto repair, and the like. And since petitioners reported state taxes on gasoline on a separate line on their itemized deductions schedule, their expenditures for gasoline would also reduce their cash available for savings, as would their expenditures for a down payment and the installment payments on the home they purchased for Ellison's mother. Petitioners supported two children for nearly all of this 22-year period, and Ellison's mother lived with petitioners *595 for seven or eight years during this period. Moreover, under petitioners' own testimony, their alleged cash hoard had been depleted somewhat during the years 1960-1965 because of the various equipment purchases and other restaurant expenditures described above in the findings of fact. In short, petitioners simply could not have accumulated cash in an amount remotely near to what they claim. In attacking respondent's net worth statements, petitioners assert that respondent did not adequately investigate petitioners' alleged nontaxable sources of income. That argument is also unavailing. In addition to corroborating petitioners' loans with third parties, respondent's agents also contacted Virginia's father, Gilbert, and Ellison's mother, Carrie, to attempt to verify petitioners' claim of having received substantial gifts from their parents. The Court is satisfied that respondent's agents conducted a full and thorough investigation. *596 Based on the whole record, the Court concludes that respondent has proved by clear and convincing evidence that petitioners could not have accumulated their alleged cash hoard from their earnings, from gifts from their parents, or from some combination of the two purported sources. The cases upon which petitioners rely to undermine respondent's net worth analysis are plaintly distinguishable. In Bryan v. United States,175 F. 2d 223 (5th Cir. 1949), respondent's own auditor admitted that he could not state that his beginning net worth computation included all of the taxpayers' assets. Such is not the case here, for respondent's agents here carefully considered all of the claimed sources of funds that petitioners identified, including their claim of the cash hoard. Respondent's net worth determination is not invalid simply because after a careful examination, he chooses to disbelieve the taxpayers' cash hoard story. Estate of Phillips v. Commissioner,246 F. 2d 209 (5th Cir. 1957), is also distinguishable because it involved unrefuted and undisputed proof of the location and amounts of the taxpayer's cash hoard. Moreover, in that case respondent *597 had not attempted to prove the amount of the taxpayer's opening cash, but assumed it was the same as the closing cash, to which the parties had stipulated, and sought to have the taxpayer prove a different amount. These factors do not appear in this case. Thomas v. Commissioner,223 F. 2d 83 (6th Cir. 1955) is also distinguishable. Unlike the case in Thomas, here respondent has submitted affirmative evidence regarding the taxpayers' cash on hand at the beginning of the net worth statement.Here respondent has adequately negated all claimed nontaxable sources of income and although not required to do so has also shown a likely source of the unreported income. See United States v. Massei,355 U.S. 595 (1958). Thus, although not required to do so, since he has negated the claimed sources of nontaxable income (the cash hoard), here respondent has also proved a likely source of the unreported income, namely, petitioners' restaurant. Since the parties have stipulated to Ellison's net earnings from the lumber company, this eliminates Ellison's employment as a likely source of the unreported income. Likewise, petitioners' rental apartments are an *598 ulikely source--the information reported on their returns with respect to the rental activity and pictures and other descriptions of the building in which the apartments are located (the second floor of the restaurant building) all indicate that it is an extremely small scale operation. The restaurant was the likely source of unreported income and generated a sufficient amount of cash to account for the amounts of unreported income that respondent has determined. Virginia's bookkeeping method was to enter gross receipts figures in a ledger and then destroy the cash register tapes and the customer checks, the only evidence of such gross receipts. Her practice precluded direct confirmation or rebuttal of her reported gross receipts. Respondent has shown a steady increase in the restaurant's business due to petitioners' remodeling during the years in issue. Finally, it is notable that petitioners' gross profit percentages (gross profit divided by gross receipts) for the two years after 1969, while their previous returns for the years now before us were being audited, are markedly higher than during the years in issue. [16]
*599 In light of the foregoing--petitioners' contradictory and implausible cash hoard story, petitioners' extensive borrowing, the minimal gifts from petitioners' parents' petitioners' spending pattern, and a likely source of unreported income (the restaurant)--we believe the record clearly and convincingly establishes that petitioners had no cash hoard. Accordingly, respondent has proved by clear and convincing evidence that petitioners have understated their income and underpaid their taxes for the years in question, the first element of the fraud under section 6653(b). Next, we must determine whether these underpayments of tax were due to fraud. The fraud envisioned by section 6501(c)(1) and section 6653(b) is actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing. Candela v. United States,635 F. 2d 1272 (7th Cir. 1980); Stoltzfus v. United States,398 F. 2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); Mitchell v. Commissioner,118 F. 2d 308 (5th Cir. 1941), *600 revg. 40 B.T.A. 424 (1939), followed on remand 45 B.T.A. 822 (1941); Wilson v. Commissioner,76 T.C. 623, 634 (1981). Respondent must show that the taxpayer intended to evade taxes by conduct calculated to conceal, mislead, or otherwise prevent collection of such taxes. Stoltzfus v. United States,supra;Webb v. Commissioner,394 F. 2d 366, 377 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Acker v. Commissioner,26 T.C. 107, 112-113 (1956). Fraud is a factual question to be determined on the basis of the entire record. Mensik v. Commissioner,supra,328 F. 2d at 150; Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F. 2d 1383 (8th Cir. 1978); Otsuki v. Commissioner,supra,53 T.C. at 105-106. Fraud can seldom be established by direct proof of the taxpayer's intention; therefore, the taxpayer's entire course of conduct must be considered and fraudulent intent *601 can be established by circumstantial evidence. Spies v. United States,317 U.S. 492 (1943); Gajewski v. Commissioner,supra,67 T.C. at 200; Stone v. Commissioner,supra,56 T.C. at 223-224; Otsuki v. Commissioner,supra,53 T.C. at 105-106. Petitioners' pattern of understating their income and consequent underpayment of their taxes for the four years in question is strong circumstantial evidence of their intent to evade taxes. Holland v. United States,supra at 139; Merritt v. Commissioner,301 F. 2d 484, 487 (5th Cir. 1962); Schwarzkopf v. Commissioner,246 F. 2d 731, 734 (3d Cir. 1957); Davis v. Commissioner,supra,239 F. 2d at 191; Vannaman v. Commissioner,54 T.C. 1011, 1018, (1970). [17] Moreover, this underreporting as an indicium of fraud takes on additional weight because of the manner in which it occurred. The most likely source of petitioners' omitted income was the restaurant business. Petitioners' omission of the restaurant income involved the deliberate falsification of gross receipts *602 records on a regular, even daily, basis over a period of four years, and the regular, systematic destruction of the cash register tapes and guest checks, the only direct evidence of the actual gross receipts. Virginia's explanation of her method of bookkeeping, that she learned this method from her parents, is unpersuasive. Virginia had to be aware that this system facilitated the omission of large amounts of gross income. Nor is her further explanation of the regular destruction of original records persuasive. Lack of storage may explain her destruction of her guest receipts, but we do not believe that lack of storage space adequately explained or justified her destruction of the cash register tapes, for those tapes would not require a great deal of storage space. Also a year's tapes and guest checks could have been retained and presented to the accountant each year, so that he could audit and verify the ledger entries for gross receipts. That was never done. The accountant never saw the ledger, let alone any original records, but was simply given a summary prepared by Virginia. The tapes would certainly take up less space than her expenditure records which Virginia kept quite *603 meticulously.Virginia's convenient destruction of all evidence directly corroborating gross receipts, while carefully retaining all evidence of deductible expenses, is a persuasive indicium of fraud. Goldsmith v. Commissioner,31 T.C. 56, 64 (1958). [18]
Next, Virginia's inconsistent and misleading statements to respondent's agents concerning petitioners' alleged cash hoard are also indicia of fraud. McGee v. Commissioner,519 F. 2d 1121, 1126 (5th Cir. 1975), affg. 61 T.C. 249 (1973); Estate of Upshaw v. Commissioner,416 F. 2d 737, 741 (7th Cir. 1969), affg. a Memorandum Opinion of this Court, cert. denied 397 U.S. 962 (1970); Gajewski v. Commissioner,supra,67 T.C. at 200. [19] In her April 9, 1970 interview with Smith, Virginia told him that the source of petitioners' unexplained increases in net worth and expenditures was petitioners' *604 savings from their lifetime of hard work. On many occasions, Virginia refused to discuss a cash hoard and on other occasions, she denied the existence of a cash hoard. This pattern of conflicting and evasive statements to respondent's agents regarding a cash hoard is another badge of fraud. We think it significant that although Virginia's attorney had been representing her for three years, it was not until immediately before the commencement of her criminal trial in May of 1973 that she told him of her alleged cash hoard. Accordingly, the consistent pattern of unreported income, strengthened by the manner in which it occurred, Virginia's destruction of her gross receipts records, and her coy game of playing with respondent's agents and even her own attorney regarding the alleged cash hoard, all lead us to conclude that respondent has proved fraud as to Virginia by clear and convincing evidence. However, we do not believe that respondent *605 has proved fraud as to Ellison. The record is clear that Virginia ran the business end of the restaurant. Ellison never cleared the register and never worked on the books. Fraud is not imputed from one spouse to another; in the case of a joint return, respondent must prove fraud on the part of each spouse. Sec. 6653(b); Hicks Co. v. Commissioner,56 T.C. 982, 1030 (1971), affd. 470 F. 2d 87 (1st Cir. 1972); Stone v. Commissioner,supra,56 T.C. at 227. [20]
Ellison was little more than a handyman, janitor, and occasional odd-job helper at the restaurant. Nothing in the record suggests that he ever saw the restaurant's records. Although he on occasion carried the restaurant gross receipt and expense summaries to Hoit, petitioners' tax return preparer, and discussed with Hoit the taxes due, those summaries were prepared by Virginia, not by Ellison. Even if Ellison had studied the summaries in detail, which the records does not indicate, Virginia's destruction of the only primary evidence (the cash register tapes and the guest checks) *606 precluded any meaningful review or corroboration of the information contained in the summaries or indeed in the ledger itself. The intent to evade taxes must exist and must be determined as of the time the return is filed, not at some earlier or later date. Fox v. Commissioner,61 T.C. 704, 717 (1974); Gleis v. Commissioner,24 T.C. 941, 952 (1955), affd. per curiam 245 F. 2d 237 (6th Cir. 1957). None of respondent's agents, nor anyone else for respondent ever interviewed Ellison until Virginia's criminal trial in 1973. Granted that Ellison's participation in the fabrication of the cash hoard story is probative, its significance is diminished by the passage of time since the tax years in issue. The Court found Ellison no more credible as a witness than Virginia, but the Court is satisfied that he participated in the attempted cover-up of the fraud but not in the original filing of fraudulent tax returns. *607 In short, respondent has failed to prove by clear and convincing evidence that Ellison knew of Virginia's systematic underreporting of income, much less that he participated in it. Respondent has failed to prove fraud on the part of Ellison. Although respondent has proved fraud only as to Virginia, that is sufficient to toll the statute of limitations against both Ellison and Virginia. Hicks Co. v. Commissioner,supra,56 T.C. at 1030; Stone v. Commissioner,supra,56 T.C. at 228; S. Rept. No. 91-1537 (1971), 1971-1 C.B. 606, 608. [21] Accordingly, the statute of limitations does not preclude respondent's assessment and collection of any deficiencies herein. Finally, as to the deficiencies themselves, respondent's proof of underpayments with respect to the undisputed items and cash on hand in his net worth computation conclusively establishes those items. Since respondent has proved the underpayments resulting from the omission of those amounts of income by clear and convincing *608 evidence, afortiori it follows that petitioners have failed to prove by the preponderance of the evidence that such amounts were not income to them. As to the remaining items, which we excluded in determining whether respondent had proved an underpayment, petitioners now bear the burden of proof. Rule 142(a). They have failed to carry that burden. Apart from the cash hoard which we have rejected, respondent's net worth computation uses a cash on hand figure of $600 for opening net worth and closing net worth for each year in issue. This is the amount of cash on hand at petitioners' restaurant and thus excludes any other cash. Undoubtedly, petitioners had some cash on their persons at the end of each year, which respondent's computations do not reflect. Nonetheless, we do not believe this invalidates respondent's net worth computations. First, respondent uses a uniform figure for each year, leaving no increase or decrease in net worth attributable to cash. Thus, only a decrease in cash on hand at the end of each year would reduce respondent's determinations of unreported income. Because of the large amounts of unreported income, any net worth decreases would *609 be de minimis. And since petitioners have established no other amounts of cash on hand, we accept respondent's figure of $600 cash on hand. As to the coin and currency collection, we reiterate that this item is irrelevant in determining the amount of income for it had no bearing in respondent's net worth computation.As to the miscellaneous personal expenditures per cancelled checks, petitioners have failed to prove that such amounts were not incurred for nondeductible personal purposes. Finally, as to the items that respondent estimated--foods/outside meals and personal expenditures (barber, beauty shop, etc.)--while these items are estimates, nonetheless, petitioners have failed to show them to be arbitrary or erroneous. Accordingly, with the exception of the mathematical error in respondent's statutory notice as to the tax reported on the 1966 return, we sustain his deficiency determinations. In summary, we sustain respondent's determination of petitioners' unreported income and his imposition of the fraud addition against Virginia. Respondent has failed to prove fraud on the part of Ellison. To reflect this and to correct the mathematical error in respondent's statutory *610 notice, Decision will be entered under Rule 155.
APPENDIX
Necessary Taxable
Year
Sales Tax Deduction
Sales Tax Rate A
Expenditure
1943
$15.00
2%
$ 750.00
1944
35.00
2%
1,750.00
1945
50.00
2%
2,500.00
1946
30.00
2%
1,500.00
1947
36.00
2%
1,800.00
1948
2%
1949
45.00
2%
2,250.00
1950
75.00
2%
3,750.00
1951
2%
1952
80.00
2%
4,000.00
1953
100.00
2%
5,000.00
1954
75.00
2%
3,750.00
1955
84.00
B 2.46%
3,417.00
1956
75.00
C 3%
2,500.00
1957
90.00
C 3%
3,000.00
1958
105.00
C 3%
3,500.00
1959
125.00
D 3.25%
3,845.00
TOTAL
$43,312.00
*611 Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in question, and all references to Rules are to the Tax Court Rules of Practice and Procedure.↩
2. Ellison also received an expense advance of $10 per day to cover his meals and the cost of a helper to unload the truck. Ellison was allowed to keep any unexpended funds.↩
1. Total expenses claimed before reduction by "Floor" (percentage of AGI). ↩
4. None were claimed or reported during these years. ↩
5. On the returns for those years, the deductions claimed for state sales taxes and gasoline taxes appear to have been lumped together. Based on petitioners' returns for the other years, which segregate between the two items, and giving petitioners the benefit of the doubt, we believe the figures shown accurately report the portion of the deduction allocable to state sales taxes. Cf. Cohan v. Commissioner,39 F. 2d 540↩ (2d Cir. 1930).
6. This is a ner figure that includes a claimed ordinary loss of $325 resulting from petitioners' 1/64 interest in a drilling venture. ↩
7. Although the total claimed for this year is $206.16, $81.16 of that was for the purchase of a car. Since a large part of the purchase price may well have come from borrowed funds that were not repaid before the end of 1959, we have accepted $125 as the proper figure.↩
2. Total taxes net of refunds and credits against subsequent years' estimated taxes. Includes "Victory Taxes" paid in 1943. ↩
3. Neither petitioners' tax returns and attached W-2 Forms nor the other evidence of record indicate how much in FICA taxes were withheld from petitioners' incomes during these years. We have calculated the amounts shown based on petitioners' reported earnings for these years and the applicable rates and wage ceilings during these years. See sections 1400, 1426(a), IRC 1939, as amended and in effect during the taxable years 1943-1951, and sections 3101, 3121(a), IRC 1954↩, as amended and in effect during the taxable year 1957. 3. This $3,500 was Ellison's intestate share of the proceeds from the estate sale rather than a gift from Carrie. See Ill. Ann. Stat. ch. 3, § 162 (Smith-Hurd 1941), now Ill. Ann. Stat. ch. 110 1/2, § 2-1 (Smith-Hurd 1978).↩
4. Although petitioners' children attended public schools in Mt. Vernon, because they lived outside of the city limits, they were required to pay tuition.↩
*. Since respondent has fraud burden of proof, we have accepted as financed only those purchases where is specific evidence of financing. Where there is no such evidence, we have treated them as cash purchases, rather than as "unspecified in record." ↩
**. We do not treat the entire $9,169 of building improvements for that year as being financed. Petitioners refinanced their home in 1965, to pay for some of the restaurant improvements, but $2,268 of the total $7,900 loan proceeds were used to pay off the prior balance, leaving only $5,632 to expend upon restaurant improvements.↩
*. The totals shown here are mathematically inaccurate, but since the parties have stipulated to these figures, we shall accept them. The mathematical errors are de minimis (five cents each year) and, in fact, favor petitioners.↩
5. We admitted the testimony of Wehrheim and Lash regarding their interviews of Gilbert solely for the purpose of establishing that respondent adequately investigated the leads identified by petitioners concerning their claimed cash hoard. Because respondent failed to establish that Gilbert was unavailable as a witness within the meaning of Rule 804(a), Federal Rules of Evidence↩, we excluded as hearsay all testimonial and documentary evidence of Gilbert's responses.
*. The statutory notice reports the 1966 taxable income as reported on petitioners' return as $11,383.Their return, a stipulated exhibit, reports their taxable income as $11,435, which we have accepted. ↩
**. The expenditures to which the parties have stipulated add up to $9,262.58 rather than the figure of $8,924.00 shown above. This latter figure was derived from respondent's deficiency notice by subtracting the disputed items from respondent's overall sum of expenditures. Since respondent has not sought an increased deficiency, we accept and use this lower sum.↩
6. Section 6501 provides in pertinent part: (a) General Rule.--Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) or, if the tax is payable by stamp, at any time after such tax became due and before the expiration of 3 years after the date on which any part of such tax was paid, and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period. * * * (c) Exceptions.-- (1) False Returns.↩--In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time. 7. Section 6653(b) provides in pertinent part that: (b) Fraud.↩--If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a). 8. See also Compton v. Commissioner,T.C. Memo. 1983-642 and Rinehart v. Commissioner,T.C. Memo. 1983-184↩. 9. See alsozack v. Commissioner,T.C. Memo. 1981-700, affd. 692 F. 2d 28 (6th Cir. 1982), cert. denied     U.S.    , 103 S. Ct. 1774 (1983); Compton v. Commissioner,supra;diehl v. Commissioner,T.C. Memo. 1982-23; Ginsburg v. Commissioner,T.C. Memo. 1976-199; Mazzoni v. Commissioner,T.C. Memo. 1970-37, affd. sub nom. Estate of Mazzoni v. Commissioner,451 F. 2d 197 (3d Cir. 1971); Foster v. Commissioner,T.C. Memo. 1965-246, affd. on fraud issue 391 F. 2d 727↩ (4th Cir. 1968). 10. Section 6653(c) defines underpayment as follows: * * * For purposes of this section, the term "underpayment" means-- (1) Income, Estate, Gift, and Certain Excise Taxes.↩--In the case of a tax to which section 6211 (relating to income, estate, gift, and certain excise taxes) is applicable, a deficiency as defined in that section (except that, for this purpose, the tax shown on a return referred to in section 6211(a)(1)(A) shall be taken into account only if such return was filed on or before the last day prescribed for the filing of such return, determined with regard to any extension of time for such filing) * * *.
11. See also Compton v. Commissioner,supra;Nunez v. Commissioner,T.C. Memo. 1969-216; Gorin v. Commissioner,T.C. Memo. 1968-57↩.
12. See Gallo v. Commissioner,T.C. Memo. 1983-367↩.
13. See also King v. Commissioner,T.C. Memo. 1979-359↩, where the Court concluded: "We find it incomprehensible that a successful businessman, such as [the taxpayer] would have no definite idea or record of the amount kept in a cash hoard."
14. See also King v. Commissioner,T.C. Memo. 1978-351, affd. without published opinion 607 F. 2d 996 (2d Cir. 1979); Mladinich v. Commissioner,T.C. Memo. 1969-185; Rice v. Commissioner,T.C. Memo. 1960-155; Helvey v. Commissioner,T.C. Memo. 1956-123↩.
15. Of course, some of the purchases could well have been made from borrowed funds rather than from petitioners' earnings. However, petitioners would have to have repaid those borrowed funds from their earnings, so the result is still the same.↩
16. Both parties spent a great deal of time discussing various methodologies in comparing gross profit percentages. We find comparison to petitioners' own gross profit in subsequent years to be the most probative. We attach little significance to respondent's reliance upon gross profit studies by the Leventhal and Howath accounting firm. We do not believe the restaurants represented in the Leventhal and Howath survey are representative of petitioners' restaurant in that those restaurants tend to be urban rather than rural and have much higher average gross receipts ($600,000 to $900,000 compared to petitioners' $100,000 to $200,000). We likewise place little reliance upon petitioners' data, namely the comparative gross profit percentages shown in respondent's revenue manual. Although these data represent more accurate statistical samples, those figures are based upon unaudited income tax returns. At bottom, we believe the most probative figure for making a comparison is petitioners' own experience in operating their own restaurant.↩
17. See also Zack v. Commissioner,supra; Dickey v. Commissioner,T.C. Memo. 1982-77; Leeper v. Commissioner,T.C. Memo. 1979-148↩. 18. Chominski v. Commissioner,T.C. Memo. 1971-1↩.
19. See also Perry v. Commissioner,T.C. Memo. 1978-451, affd. in an unpublished order (7th Cir. 1979); Foster v. Commissioner,T.C. Memo. 1972-188, affd. 487 F. 2d 902↩ (6th Cir. 1973).
20. See also Bourque v. Commissioner,T.C. Memo. 1980-286; Perry v. Commissioner,supra.↩
21. See also Dante v. Commissioner,T.C. Memo. 1978-126; Stone v. Commissioner,T.C. Memo. 1977-147↩.
A. See Ill. Ann. Stat. ch. 120, § 441, Historical Note (Smith-Hurd 1974). ↩
B. On July 1, 1955, the tax rate was raised to 2.5 percent. On August 1, 1955, cities were authorized to levy an additional.5 percent. The record does not indicate whether or when Mt. Vernon levied the.5 percent. Because a higher tax rate means a lower amount of required expenditures, we have assumed that Mt. Vernon levied its.5 percent beginning August 1, 1955. Change in tax rate yields overall rate as follows: (6 months X 2%) + (1 month X 2.5%) + (5 months X 3%) = 2.4583% / 12 months ↩
C. Assumes full local levy of.5 percent during entire year. ↩
D. On July 1, 1959, the state tax rate was raised to 3 percent, which, coupled with.5 percent permitted local levy, left overall rate of 3.5 percent. Effective rate of 3.25 percent is an average, six months at 3 percent and six months at 3.5 percent.↩