# United States Tax Court

T.C. Memo. 2023-155

DAVID VILLA AND JUANA M. VILLA,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 8177-20.                    Filed December 28, 2023.

————

*Juan F. Vasquez, Jr.*, and *Tania P. Albuja*, for petitioners.

*Steven D. Garza*, *Carol Bingham McClure*, and *Kevin A. Baker*, for respondent.


## MEMORANDUM FINDINGS OF FACT AND OPINION

COPELAND, *Judge*: Petitioner David Villa builds fences, sometimes as a contractor and other times as a subcontractor. The Commissioner of Internal Revenue (Commissioner) audited the 2016 and 2017 joint federal income tax returns of Mr. Villa and his wife, Juana M. Villa. On the basis of a bank deposits analysis, the Commissioner determined unreported gross receipts from Mr. Villa's contracting work in both 2016 and 2017 (years in issue). The Commissioner accordingly issued a notice of deficiency in which he also disallowed deductions for certain expenses and determined accuracy-related penalties under section 6662(a).[1] After concessions from both parties (as explained below), we must decide whether the Villas are

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C. or Code), in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. Some dollar amounts are rounded.

[*2] entitled to costs of goods sold offsets to gross income (or, in the alternative, additional expenses) and whether they are liable for the accuracy-related penalties.

## FINDINGS OF FACT

Some of the facts have been stipulated by the parties. The Stipulation of Facts, Supplemental Stipulation of Facts, and attached Exhibits are incorporated by this reference. The Villas were residents of Texas when they timely filed their Petition.

I.  *Fencing Business*

Mr. Villa was born in Mexico and moved to the United States in 1998 with his father. He completed elementary school in Mexico and attended (but did not complete) high school in the Unites States. Mr. Villa went into the fence-building business with his father after they immigrated. Mr. Villa now runs the business as a sole proprietorship.

During the years in issue Mr. Villa worked as a subcontractor for 10 Point, Inc., d.b.a. All-Texas Fence (All-Texas), and as a direct contractor for various customers. All-Texas supplied Mr. Villa with the wood for his subcontractor projects, but he was responsible for all other costs (including tools, labor, and transportation). For his direct contracting work, Mr. Villa had to pay out of pocket for both the materials and his other costs.

All-Texas paid Mr. Villa nonemployee compensation of $26,022 in 2016 and $28,314 in 2017, and it reported those amounts to Mr. Villa and the Internal Revenue Service (IRS) on Forms 1099–MISC, Miscellaneous Income. For his direct contracting work, Mr. Villa received payments totaling about $20,817 in 2016 and $40,630 in 2017.[2] When Mr. Villa received a check as payment for his work, he often would deposit the check but immediately withdraw a portion in cash. He would use that cash to pay both (1) his business costs and expenses and (2) personal expenses. These immediate withdrawals, marked "less cash" on the bank deposit slips, totaled $8,996 in 2016 and $16,480 in 2017. During the years in issue Mr. Villa used both cash and debit cards to pay his business costs and expenses; he kept some but not all receipts related to those items.

---

[2] These amounts are drawn from the Commissioner's bank deposits analysis, discussed below.

**[\*3]** II.    *Tax Returns*

Mr. Villa asked his cousin to prepare his and Mrs. Villa's joint income tax returns for each year in issue.  Mr. Villa's cousin was then teaching physical education classes and had taken some accounting classes but was not a licensed accountant.  Mr. Villa was aware of these facts but relied on his cousin, in part because the cousin previously had helped Mr. Villa's father and brothers prepare their tax returns.  Mr. Villa supplied his cousin with various relevant documents, and his cousin prepared the returns for free as a favor to Mr. Villa.

On the returns for the years in issue the only gross income that the Villas reported was the payments from All-Texas.  They did not report any of the payments for Mr. Villa's direct contracting work, and none of the direct contracting customers had reported their payments to him on an information return such as a Form 1099–MISC.  On the attached Schedules C, Profit or Loss From Business, Mr. Villa deducted contract labor expenses of $8,750 for 2016 and $10,501 for 2017 and "other" expenses of $11,690 for 2016 and $12,096 for 2017.

III.    *Examination and Notice of Deficiency*

After selecting the Villas' returns for examination, the Commissioner conducted a bank deposits analysis and, in a notice of deficiency dated March 18, 2020, determined that the Villas' gross income for both years in issue should be increased by the payments Mr. Villa received for his direct contracting work.  Also, on the basis of the receipts and other documents Mr. Villa produced to substantiate the expenses reported on the Schedules C, the Commissioner determined adjustments to those expenses.  For 2016 he decreased contract labor expenses from $8,750 (per the return) to $4,814, and he decreased "other" expenses from $11,690 to $2,860.  For 2017 he increased contract labor expenses from $10,501 to $11,881 and decreased "other" expenses from $12,096 to zero.

The notice of deficiency also determined an accuracy-related penalty under section 6662(a) for each year in issue. The Commissioner determined that the Villas' underpayment of tax for each year is attributable to negligence or disregard of rules or regulations, *see* I.R.C. § 6662(b)(1), and/or a substantial understatement of income tax, *see* I.R.C. § 6662(b)(2). Attached to the notice of deficiency is a Civil Penalty Approval Form that lists negligence as the primary civil penalty position and substantial understatement as an alternative position.  The form

[*4] was signed on March 9, 2020, by the supervisor of the IRS official who initially determined the penalties.

IV.     *The Parties' Concessions and Positions*

Before trial the Villas conceded the increases in their gross income for both years as determined in the notice of deficiency. The Commissioner conceded certain expenses after review of additional receipts produced by Mr. Villa and some of the Villas' bank statements (which also reflect debit card transactions and withdrawals). Specifically, for 2016 the Commissioner agreed to increase contract labor expenses back to $8,750 (as reported on the return) and to increase "other" expenses to $4,108. For 2017 the Commissioner agreed to increase "other" expenses from zero to $10,837.

The Villas ask us to determine that Mr. Villa's Schedule C net profit should be further reduced by costs of goods sold of $8,996 for 2016 and $16,480 for 2017, on the basis of Mr. Villa's "less cash" withdrawals, as supported by an estimate of his average profit margin (described below).

The amounts at issue are summarized in the following tables:

| 2016 Amounts | Reported on Schedule C | Determined in the Notice of Deficiency | Agreed by Parties Before Trial[3] | Claimed by the Villas |
|---|---|---|---|---|
| Gross Receipts | $26,022 | $46,839 | $46,839 | $46,839 |
| Cost of Goods Sold | — | — | — | (8,996) |
| Contract Labor | (8,750) | (4,814) | (8,750) | (8,750) |
| Other Expenses | (11,690) | (2,860) | (4,108) | (4,108) |
| **Net Profit** | **$5,582** | **$39,165** | **$33,981** | **$24,985** |

---

[3] Before trial the Villas agreed only that Mr. Villa's contract labor and "other" expenses for 2016 and 2017 were *at least* the amounts shown below. They contend that to the extent their claimed cost of goods sold amounts are not allowed, the "less cash" withdrawal amounts alternatively should increase the contract labor and "other" expense deductions.

| [*5]<br>*2017 Amounts* | *Reported on Schedule C* | *Determined in the Notice of Deficiency* | *Agreed by Parties Before Trial*[4] | *Claimed by the Villas* |
|---|---|---|---|---|
| Gross Receipts | $28,314 | $68,944 | $68,944 | $68,944 |
| Cost of Goods Sold | — | — | — | (16,480) |
| Contract Labor | (10,501) | (11,881) | (11,881) | (11,881) |
| Other Expenses | (12,096) | — | (10,837) | (10,837) |
| **Net Profit** | **$5,717** | **$57,063** | **$46,226** | **$29,746** |

OPINION

I.   *Burden of Proof*

Generally, the Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving that those determinations are erroneous. *See* Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). Further, a taxpayer is required to maintain sufficient permanent records to substantiate all components of reported net income, including deductible business expenses and cost of goods sold. *See* I.R.C. § 6001; Treas. Reg. § 1.6001-1(a). The burden of showing entitlement to a claimed deduction (from gross income) or reduction (from gross receipts) is on the taxpayer. *See* Rule 142(a); *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992). The Villas do not contend, and the evidence does not establish, that the burden of proof shifts to the Commissioner under section 7491(a) as to any issue of fact.

If a taxpayer clearly shows that he incurred a deductible expense but is unable to substantiate the exact amount, the "*Cohan* rule" permits the Court to estimate the amount of the expense, provided there is a reasonable basis for making such an estimate. *See Cohan v. Commissioner*, 39 F.2d 540, 543–44 (2d Cir. 1930); *Vanicek v. Commissioner*, 85 T.C. 731, 742–43 (1985); *Goldsmith v. Commissioner*, 31 T.C. 56, 62 (1958). In making an estimate under the *Cohan* rule, the

---

[4] *See supra* note 3.

[*6] Court "bear[s] heavily if it chooses upon the taxpayer whose inexactitude is of his own making." *Cohan v. Commissioner*, 39 F.2d at 544. Further, while the *Cohan* rule by its terms applies to deductible expenses, this Court has adapted it to estimate cost of goods sold as well. *See, e.g.*, *Olive v. Commissioner*, 139 T.C. 19, 34 (2012), *aff'd*, 792 F.3d 1146 (9th Cir. 2015); *Alterman v. Commissioner*, T.C. Memo. 2018-83, at *30–31; *Huzella v. Commissioner*, T.C. Memo. 2017-210, at *7–9. However, the Court may not use the *Cohan* rule to estimate expenses covered by the strict substantiation requirements of section 274(d) (which during the years in issue applied to most expenses for transportation, lodging, meals and entertainment, among other things). *See Sanford v. Commissioner*, 50 T.C. 823, 827–29 (1968), *aff'd per curiam*, 412 F.2d 201 (2d Cir. 1969).

## II. *Cost of Goods Sold*

Deductions from gross income—such as for "ordinary and necessary" business expenses, *see* I.R.C. § 162(a)—are a matter of legislative grace and are allowed only to the extent provided by statute, *see INDOPCO, Inc. v. Commissioner*, 503 U.S. at 84; *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934). By contrast, the reduction of gross receipts by cost of goods sold is mandatory (i.e., not a matter of legislative grace), as only income is taxable under the Sixteenth Amendment. *See Doyle v. Mitchell Bros.*, 247 U.S. 179, 184–85 (1918); *BRC Operating Co. v. Commissioner*, T.C. Memo. 2021-59, at *8; Treas. Reg. § 1.61-3(a) (providing that gross receipts are reduced by cost of goods sold to arrive at gross income).

Mr. Villa testified that he used his "less cash" withdrawals to pay for both business needs (including fencing materials and contract labor) and personal expenses. He did not specify what proportion of the withdrawals went towards business needs versus personal expenses. He provided a small amount of evidence indicating that he made modest cash payments to a fencing supply distribution company and large cash payments toward business-related accounts he held at Lowe's and Home Depot. Mr. Villa also testified about the details of recent work he performed on one of his direct contracting jobs: He built an 81-foot fence using $1,584 of materials and $166 of contract labor, and the customer paid $2,400. The Villas ask the Court to use this sample job as a basis for estimating total cost of goods sold. They suggest that the job's 73%[5] ratio between cost of goods sold and gross receipts can be used to fairly

---

[5] ($1,584 + $166) ÷ $2,400 = 73%.

[*7] estimate Mr. Villa's total cost of goods sold for both years in issue. However, because Mr. Villa did not pay for the materials used in his subcontracting work for All-Texas, the Villas agree that we should apply the 73% ratio only to the gross receipts from Mr. Villa's direct contracting work. The parties agreed that those gross receipts were $20,817 for 2016 and $40,630 for 2017, yielding (as the Villas see it) an estimated cost of goods sold of $15,196 for 2016 and $29,660 for 2017.[6]

While the Court found Mr. Villa's testimony about this sample job credible and likely representative of the direct contracting work that Mr. Villa completed during the years in issue, it does not apply to the indeterminate portion of the "less cash" withdrawals that Mr. Villas admitted he used for personal expenses. In addition, it is unclear from the record whether some portion of the above-estimated cost of goods sold for Mr. Villa's direct contracting work might already have been included in the stipulated contract labor or "other" expenses—and such inexactitude will be held against the Villas under the *Cohan* rule. In particular, neither the Villas nor the Commissioner explained to the Court the composition of the Schedule C "other" expenses the parties agreed to before trial: $4,108 for 2016 and $10,837 for 2017. It is unclear to what extent these amounts include materials Mr. Villa used in his direct contracting work. It is clear, however, that a substantial portion of the "less cash" withdrawals represent material and labor costs. Accordingly, we will allow 50% of the "less cash" withdrawals as cost of goods sold. As a result, costs of goods sold of $4,498 for 2016 and $8,240 for 2017 are allowed.[7]

III. *Redetermined Net Profit*

We therefore redetermine the following amounts of Schedule C net profit (and thus of total income) for the years in issue:

---

[6] Mr. Villa's trial testimony was ambiguous about whether All-Texas supplied him only with wood or with all materials needed for the fences he built as a subcontractor. Even if we were to assume that Mr. Villa paid for the nonwood materials for his subcontracting work, we would have no reasonable basis for estimating those costs under the *Cohan* rule.

[7] Calculated from the "less cash" amounts as follows: $8,996 × 50% = $4,498 for 2016 and $16,480 × 50% = $8,240 for 2017.

| [*8] | *2016 Amounts* | *2017 Amounts* |
|---|---|---|
| Gross Receipts | $46,839 | $68,944 |
| Cost of Goods Sold | (4,498) | (8,240) |
| Contract Labor | (8,750) | (11,881) |
| Other Expenses[8] | (4,108) | (10,837) |
| **Net Profit** | **$29,483** | **$37,986** |

## IV.  *Accuracy-Related Penalties*

Section 6662(a) imposes a 20% penalty on any portion of an underpayment of tax attributable to (among other things) negligence or disregard of rules or regulations or a substantial understatement of income tax.  I.R.C. § 6662(b)(1) and (2).  "Negligence" includes any failure to make a reasonable attempt to comply with the internal revenue laws or to exercise reasonable care in the preparation of a tax return.  I.R.C. § 6662(c); Treas. Reg. § 1.6662-3(b)(1).  "Disregard" includes any careless, reckless, or intentional disregard of the Code, regulations, or certain IRS administrative guidance.  I.R.C. § 6662(c); Treas. Reg. § 1.6662-3(b)(2).  An understatement of income tax is substantial if it exceeds the greater of 10% of the tax required to be shown on the return for the year in question or $5,000.  I.R.C. § 6662(d)(1)(A).

Under section 7491(c), the Commissioner bears the burden of production regarding penalties for individual taxpayers and must come forward with sufficient evidence indicating that it is appropriate to impose a penalty.  *Higbee v. Commissioner*, 116 T.C. 438, 446–47 (2001).  One part of this burden is to show compliance with section 6751(b)(1), which provides that "[n]o penalty . . . shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination."  *See Graev v. Commissioner*, 149 T.C. 485, 493 (2017), *supplementing and*

---

[8] Because we have determined the portion of "less cash" withdrawals allocable to cost of goods sold, we do not reach the Villas' alternative argument that such amounts could also be considered contract labor or "other" expenses beyond the stipulated amounts.  We have no basis in the record for further increasing the latter two categories.

**[\*9]** *overruling in part* 147 T.C. 460 (2016). The Villas do not dispute that the Civil Penalty Approval Form attached to the notice of deficiency establishes that the Commissioner complied with section 6751(b)(1).

As for the substantive part of the Commissioner's burden, he has established that the Villas failed to report any of Mr. Villa's gross receipts from his direct contracting work. This was a clear instance of reckless (if not intentional) disregard for the rule of section 61 that gross income includes income "from whatever source derived" absent a clear exclusion provided by law. *See* Treas. Reg. § 1.6662-3(b)(2) (defining an instance of disregard as "reckless" if the taxpayer "makes little or no effort to determine whether a rule or regulation exists, under circumstances which demonstrate a substantial deviation from the standard of conduct that a reasonable person would observe"). The Commissioner therefore has made a prima facie case for imposing the penalties under section 6662(a) and (b)(1). In addition, the understatements in this case are clearly substantial under section 6662(b)(2) and (d).

Section 6664(c)(1) generally provides an exception to the section 6662 penalty with respect to any portion of an underpayment "if it is shown that there was reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion." The determination as to whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, considering all pertinent facts and circumstances. Treas. Reg. § 1.6664-4(b)(1). Generally the most important factor in determining the existence of reasonable cause is the taxpayer's effort to ascertain his or her correct tax liability. *Id.* Circumstances that may signal reasonable cause and good faith "include an honest misunderstanding of fact or law that is reasonable in light of all the facts and circumstances, including the experience, knowledge, and education of the taxpayer." *Id.* Reliance on professional advice "constitutes reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith." *Id.*; *see also Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 98–99 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002).

The only explanation Mr. Villa offered for failing to report any gross receipts from his direct contracting work is that those customers did not send him Forms 1099–MISC or any other information returns, and he therefore "didn't know how to" report that income. Even if we assume that Mr. Villa honestly believed that he owed tax only on amounts reported to him via information returns, such an honest

**[\*10]** misunderstanding would not have been reasonable. Any reasonable person in Mr. Villa's position—with his same education and experience—would have suspected that an exclusion for the income from his direct contracting work would be "too good to be true" and would have inquired into whether such an exclusion really exists (and would have ascertained that it does not).

Likewise, Mr. Villa's reliance on his cousin to prepare the Villas' tax returns was unreasonable under the circumstances. The record does not show whether Mr. Villa's cousin was aware of the gross receipts from the direct contracting work. In either case, however, Mr. Villa's reliance was unreasonable. If the cousin knew of the gross receipts and told Mr. Villa they were not taxable, then Mr. Villa was unreasonable in relying on such advice: It would have been incredible on its face and would have warranted further investigation on Mr. Villa's part—all the more so because his cousin was not a professional tax advisor or accountant. *See* Treas. Reg. § 1.6664-4(c)(1)(ii) ("The advice must not be based on unreasonable factual or legal assumptions . . . ."). If the cousin was not aware of the gross receipts, then Mr. Villa could not have trusted his cousin to prepare an accurate return. *Id.* ("[T]he advice must not be based upon a representation or assumption which the taxpayer knows, or has reason to know, is unlikely to be true . . . .").

We therefore hold the Villas liable for the penalties under section 6662(a) applicable to the deficiencies for both years in issue. We have considered all the arguments made by the parties and, to the extent they are not addressed herein, we find them moot, irrelevant, or without merit.

To reflect the foregoing,

*Decision will be entered under Rule 155.*